526 A.2d 955

**STATE of Maryland**

v.

**Larry Ramoun STANDIFUR and Colonel Hillard Henry.**

No. 136, Sept. Term, 1985.

Court of Appeals of Maryland.

June 19, 1987.

4

Valerie J. Smith, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen. and Deborah K. Chasanow, Asst. Atty. Gen., on the brief), Baltimore, for appellant.

Melissa M. Moore, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for Larry Ramoun Standifur.

Andre M. Davis (William H. Murphy, Jr. and Lecia M. Eason, on the brief), Baltimore, for Colonel Hillard Henry.

Argued before MURPHY, C.J., and SMITH *, ELDRIDGE, COLE, RODOWSKY, COUCH * and McAULIFFE, JJ.

McAULIFFE, Judge.

This case presents the question of whether a declaration against the penal interest of an unavailable witness, offered by the State against the accused in a criminal trial, is sufficiently reliable to qualify under the common law exception to the hearsay rule and to satisfy the Confrontation

---

* Smith and Couch, JJ., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

Clauses of the Constitution of the United States and the Declaration of Rights of Maryland.

The Appellees, Larry Ramoun Standifur and Colonel Hillard Henry, were indicted on various criminal charges as accomplices in the same criminal episode, but were tried separately. Henry was tried by the Circuit Court for Cecil County and was convicted of housebreaking and of theft over $300.00. Standifur was convicted of the same offenses by a Cecil County jury.

The facts that led to the convictions are as follows: The home of Lynn and Dale Jackson was broken into on September 2, 1983. The items of personal property stolen from the residence included two shotguns, one of which was a Winchester Model 97 pump shotgun. On January 5, 1984, Trooper Robert Faul of the Maryland State Police recovered the Winchester Model 97 shotgun from the Bel Air Gun Exchange. The proprietor of the gun shop told Faul the gun had been purchased from Bruce A. Burkett, whose name appeared on the exchange slip. The next day Burkett told Faul he had purchased the shotgun from James Clyde Richard, nicknamed "Sly," for $75.00 on October 17, 1983. Burkett said the purchase occurred at the home of a mutual friend, and that he had not previously been acquainted with Sly. Troopers Faul and Dickson, together with Sergeant Schulz, then proceeded to Sly's apartment in Harford County to question him about the gun. When the officers arrived at Sly's apartment, Sly attempted to flee via a rear balcony but Sergeant Schulz caught him and returned him to the apartment. According to Faul, Sly then produced a key, opened the door to the apartment and invited the police inside. Sly explained that he fled because he was on probation and believed the police might have come to serve indictments alleging drug activities on his part. Faul assured Sly he was not there about drug charges or a violation of probation, but rather about a gun that Sly had allegedly sold to Burkett. The troopers did not place Sly under arrest, nor did they advise him of his Miranda rights.

Sly told Faul that he had purchased the gun in the Washington Park area of Aberdeen, Maryland after being approached by Colonel Henry. He said that Henry, Standifur, and a third man, Henderson, drove up in a green and white Volkswagen van which Standifur was driving. Sly said Henry showed him two shotguns, and Sly purchased the Winchester for $30.00. Sly told Faul he normally would not have bought the gun because he had a limited amount of cash that he intended to use to buy heroin, but he feared Henry would have taken the money in any event because Henry "had a history of such stuff." Sly said Henry told him they had obtained the shotguns in Pennsylvania. Sly told Faul he suspected the guns had been stolen. He said it was common knowledge that Henry, Standifur, and Henderson were stealing to support their drug habits.

Sly then voluntarily accompanied the troopers to the Bel Air Barrack where Faul took a written statement from Sly concerning the shotgun. The details of this statement coincided with those of the earlier oral statement, except that in the written statement Sly said of the shotgun that "I bought it in good faith and I sold it in good faith."

At the trials of Henry and Standifur, Burkett testified that he purchased the Winchester shotgun for $75.00 from a man called Sly and received a handwritten bill of sale from him. When the gun developed mechanical problems, Burkett sold it to the Bel Air Gun Exchange.

Winfred Henderson testified against both Standifur and Henry, pursuant to a plea agreement Henderson had reached with the State. He testified that Henry, Standifur and he broke and entered the Jackson's home and stole some guns, jewelry and a stereo amplifier. According to Henderson, the three drove to the Jackson home in a green and white VW van owned by Henderson's sister, who was also Standifur's girlfriend. He said that Henry sold the shotgun to a man named Sly for $30.00 at Washington Park while he and Standifur sat in the van.

At an evidentiary hearing held at each trial the State sought to introduce through Trooper Faul the oral statements Sly had made concerning his purchase of the gun. At each trial, Faul testified out of the hearing of the jury concerning the State's efforts to locate Sly and the fact that he could not be found. At Standifur's hearing, the assistant state's attorney proffered the testimony of Faul concerning the contents of Sly's oral statement and the circumstances under which it had been received, and pointed out that the statement had been admitted in Henry's trial. At each hearing Faul's written notes of Sly's oral statement and a copy of Sly's written statement were received and considered by the trial judge.[1]

In Henry's case, Judge Donaldson Cole found that Sly's statement was a declaration against penal interest because Sly suspected the gun was stolen at the time he made the statement. Judge Cole also noted that the statement was corroborated by other evidence produced by the State. Relying on *Jacobs v. State*, 45 Md.App. 634, 415 A.2d 590, *cert. denied*, 288 Md. 737 (1980), and *Agnew v. State*, 51 Md.App. 614, 446 A.2d 425 (1982), the trial judge ruled the statement admissible. Similarly, in Standifur's case Judge E.D.E. Rollins concluded that Sly's statement was trustworthy and

---

1. Standifur argues in his brief that there was a variance between the proffer made by the assistant state's attorney and the testimony actually given by Faul, and that "nowhere in his evidence did Trooper Faul state that Sly told him that he (Sly) suspected the gun was stolen." The ruling on admissibility was made upon the proffer and upon the contents of Faul's notes which were given to the judge as a part of the proffer without objection. Faul had testified fully at Henry's hearing, just 24 days earlier. Standifur's attorney had also represented Henry, and he did not request additional sworn testimony at Standifur's hearing except as to the alleged unavailability of Sly. In each case, at the direction of the trial judge and with the concurrence of counsel, Faul's testimony before the jury concerning Sly's statement omitted any reference to Sly's suspicion that the shotgun was stolen, or to any of the reasons for that suspicion. That evidence was material to the question of admissibility, but properly excluded from the evidence at trial. The suggestion of error by reason of a variance between the proffer and the evidence at trial is therefore without merit.

important evidence, and admitted it as a declaration against penal interest.

The Court of Special Appeals reversed both convictions. In *Standifur v. State,* 64 Md.App. 570, 497 A.2d 1164 (1985), the court held the trial judge erred in finding that a person in Sly's position would probably have perceived the disserving nature of his oral statement. The intermediate appellate court also suggested that the facts were insufficient to permit a determination as to Sly's state of mind at the time he made the statement, and particularly as to whether Sly had a probable motive to falsify his statement. Henry's case was decided on the same grounds in a separate unreported opinion. We granted the State's petition for certiorari in each case and consolidated the cases for this appeal.

The State concedes that Sly's statement is hearsay, but contends it was properly admitted as a declaration against penal interest. Moreover, the State maintains that because of the presence of circumstantial guarantees of trustworthiness the s atement also satisfies the Confrontation Clauses of the Twenty-First Article of the Maryland Declaration of Rights and the Sixth Amendment of the United States Constitution. Respondents contend the Court of Special Appeals properly found that Sly's statement did not constitute a declaration against penal interest. Additionally, they contend that even if the statement that Sly had purchased a gun that he suspected to have been stolen was of a disserving character, that part of the statement had an insufficient nexus with the part admitted into evidence, i.e. that Sly had purchased the gun from Standifur, Henry and Henderson. Finally, Respondents maintain that the content of the statement and the totality of circumstances surrounding it fail to demonstrate the particularized guarantees of trustworthiness constitutionally mandated by the Confrontation Clause.

This Court has recognized a declaration against penal interest as an exception to the hearsay rule. *Aetna Casualty & Surety v. Kuhl,* 296 Md. 446, 463 A.2d 822 (1983); *Merrick v. State,* 283 Md. 1, 389 A.2d 328 (1978); *Brady v.*

*State*, 226 Md. 422, 174 A.2d 167 (1961), *aff'd sub nom.*, *Brady v. Md.*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Thomas v. State*, 186 Md. 446, 47 A.2d 43 (1946). *See also Agnew v. State, supra*, 51 Md.App. 614, 446 A.2d 425; *Jacobs v. State, supra*, 45 Md.App. 634, 415 A.2d 590.[2] This case requires consideration of a specific class of declarations against penal interest—those offered by the State to inculpate a defendant in a criminal case. A declaration against penal interest is excepted from the operation of the hearsay rule by the Federal Rules of Evidence and by a majority of the states. Federal Rule of Evidence 804(b)(3) provides:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> \* \* \* \* \* \*
>
> (3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a

---

**2.** At common law, a declaration against penal interest was not recognized as an exception to the hearsay rule. The refusal to recognize this exception originated in the *Sussex Peerage* case, 8 Eng.Rep. 1034 (1844). The case arose after the death of the Duke of Sussex when his son Frederick D'Este claimed his father's "honors, dignities, and privileges." *Id.* at 1035. D'Este claimed that Mr. Gunn, a minister, had married his mother and father even though the Duke had not received the King's permission as required by the Royal Marriage Act. To prove that his father had married, D'Este offered an undated statement of Mr. Gunn to his son that he married the Duke and his wife. Because it was a crime to marry a person who had not complied with the Royal Marriage Act, D'Este argued Gunn's statement was against his penal interest and therefore trustworthy. However, the House of Lords determined that a declaration confessing a crime committed by a declarant was not receivable as a declaration against interest. The Supreme Court accepted the English rule without scrutiny in *Donnelly v. United States*, 228 U.S. 243, 272–77, 33 S.Ct. 449, 459–461, 57 L.Ed. 820 (1913). *See also Thomas v. State*, 186 Md. 446, 47 A.2d 43 (1946). *McCormick on Evidence* § 278, at 822–23 (E. Cleary 3d ed. 1984); P. Tague, *Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 Geo. L.J. 851 (1981).

reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The underlying theory of this exception is that "persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Fed. R.Evid. 804(b)(3) advisory committee note. The note further states:

[A]ll statements implicating another person [need not] be excluded from the category of declarations against interest. Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.... On the other hand, the same words spoken under different circumstances, *e.g.*, to an acquaintance, would have no difficulty in qualifying. The rule does not purport to deal with questions of the right of confrontation.

For a discussion of the legislative history *see* P. Tague, *Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 Geo. L.J. 851, 892–97 (1981); Comment, *Federal Rule of Evidence 804(b)(3) and Inculpatory Statements Against Penal Interest*, 66 Calif.L.Rev. 1189, 1191–98 (1978); Comment, *Inculpatory Statements Against Penal Interest and the Confrontation Clause*, 83 Colum.L.Rev. 159, 174–78 (1983); *Weinstein's Evidence* § 804(b)(3)[03], at 804–104 (1985).

A majority of the states recognize the exception to the hearsay rule in their rules of evidence, most of which are patterned after the Federal Rules of Evidence. *See Weinstein's Evidence, supra,* at 804–157 to 163. A number of

states recognize the exception but expressly exclude inculpatory statements that implicate third persons. *Id.*

In *United States v. Alvarez,* 584 F.2d 694, 699 (5th Cir.1978), the Fifth Circuit Court of Appeals articulated the requirements of the federal rule in this manner:

(1) the declarant must be unavailable, (2) the statement must so far tend to subject the declarant to criminal liability " 'that a reasonable man in his position would not have made the statement unless he believed it to be true'; and [ (3) ] if offered to exculpate the accused [the statement] must be corroborated by circumstances clearly indicating its trustworthiness." (citation omitted).

Standifur and Henry do not here challenge the findings of the trial judges that Sly was unavailable within the meaning of the hearsay rule. We therefore turn to the question of whether the statement qualifies as a declaration against interest under the law of evidence of this State.

■ The circumstances surrounding the making of the statement must be carefully analyzed to determine the likelihood that the statement was truthful. Critical to this analysis is the state of mind of the declarant at the time the statement was made. Unless the declarant then believed the statement to be against his penal interest, there is no basis for presumed reliability. However, because of the unavailability of the declarant and other problems of proof, the party urging this exception is not required to prove the actual state of mind of the declarant but must prove sufficient surrounding facts from which the trial judge may inferentially determine what the state of mind of a reasonable person would have been under the same or similar circumstances. Although this test is essentially objective, it does envision consideration of the entire panoply of surrounding circumstances to the extent they may be known, including the age, education, background, experience and condition of the declarant. "Reasonable" as used in this context connotes a non-aberrant reaction by one in the defendant's circumstances, rather than the expected reac-

tion of a hypothetical person of reasonable intelligence or sobriety. Thus, a trial judge may be called upon to determine whether a reasonable person who is under the influence or alcohol or drugs would have understood the disserving nature of a particular statement.

The statement must in fact be against the penal interest of the declarant. It need not be a full confession but must involve substantial exposure to criminal liability. *McCormick on Evidence* § 279, at 825 (E. Cleary 3d ed. 1984). That exposure, however, is only a beginning point of inquiry. The more important criterion is that a reasonable person in the situation of the declarant would have perceived the statement as disserving at the time he made it. The fact that legal scholars may agree as to the disserving nature of a particular statement does not mean that a reasonable person in the speaker's place would have so understood it. The declarant's probable perception of the statement's disserving nature forms the basis for the exception, and without it the exception cannot be utilized.

In determining the probable state of mind of a reasonable person in the position of the declarant, it is perhaps as important to consider the totality of circumstances under which the statement was made as to consider the contents of the statement. If experience tells us that we may presume trustworthiness when one is recounting symptoms to a physician who is to treat him, it also tells us that we must treat as "inevitably suspect" a statement made to persons in authority and implicating a codefendant, even though the statement also contains an admission of the declarant's culpability. *Cruz v. New York*, — U.S. —, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). A defendant implicating his confederate may do so to curry favor with the authorities, to achieve a plea bargain, to shift the blame by showing that another was more culpable, or simply to have another with whom to share the blame. In *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986), Justice Brennan said for the Court:

**14**

> As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.

The Court quoted with approval Justice White's observations in his dissenting opinion in *Bruton* that an accomplice's confession

> is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally ... More than this, however, the post-arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence. *Id.* 106 S.Ct. at 2062.

Referring to the earlier case of *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1964), in which the conviction was reversed because of the prosecutor's use of an accomplice's confession, the Court said:

> This holding, on which the Court was unanimously agreed, was premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of the cross-examination.
>
> Over the years since *Douglas,* the Court has spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants. Even Justice Harlan, who was generally adverse to what he regarded as an expansive reading of the confrontation right, stated that he "would be prepared to hold as a matter of due process that a confession of an accomplice resulting from formal police interrogation cannot be introduced as evidence of the guilt of an accused, absent some circumstance indicating authorization or adoption."

*Dutton v. Evans*, 400 U.S. 74, 98, 91 S.Ct. 210, 224, 27 L.Ed.2d 213 (1970) (concurring in the judgment). *Lee, supra*, 106 S.Ct. at 2062–63.

Distrust in the reliability of an accomplice's statement, perhaps coupled with a residuum of general suspicion concerning the worth of the declaration against penal interest exception, prompted the advisory committee to include in the first drafts of proposed Fed.R.Evid. 804(b)(3) this concluding sentence:

> This exception does not include a statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused.

This sentence was later deleted, apparently not so much in the belief that it did not accurately reflect the holdings of the Supreme Court on the constitutional question of confrontation, but in the realization that it would be unwise to codify a proposition that might represent only a step in the development of a dynamic area of the law. The message to be gleaned from the cases and from the history of the federal rule is clear—inculpatory statements of an accomplice no longer involved in the criminal enterprise[3] are inherently suspect and the particular circumstances surrounding the making of such statements must be carefully examined.

We turn now to the several forms that an inculpatory statement may take, and the problems thereby created. Inculpatory statements may be divided into collateral and noncollateral statements. A noncollateral statement is one

---

3. No similar distrust exists with respect to statements made by co-conspirators during the continuation of the conspiracy, *Dutton v. Evans, supra*, 400 U.S. 74, and the Supreme Court recently held that a showing of the declarant's unavailability is not a prerequisite to the admission of such statements. *U.S. v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). As the Court said in *Lee v. Illinois, supra*, 106 S.Ct. at 2064, it is a reality of the criminal process that "once partners in a crime recognize that the 'jig is up' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices."

in which the facts inculpating the defendant are found in the portion of the statement directly against the declarant's interest. A collateral inculpatory declaration is one in which the inculpatory material is not found in the portion of the statement directly against the declarant's interest, but instead appears in another portion of the statement. *McCormick on Evidence, supra,* at 825–26 refers to collateral inculpating statements as "contextual" or related statements, and suggests that the nexus required between the collateral statement and the material inculpatory to the declarant is subject to more exacting scrutiny in criminal than in civil cases.

When the statement is offered by way of exculpating the accused, complete rejection of related or contextual statements is not insisted upon, although a rather tight integration appears to be contemplated. However, when the statement is offered by the prosecution to inculpate the accused, an even stricter approach is sometimes found: the requirements of the Confrontation Clause of the Sixth Amendment are said in some judicial opinions to require rejection of any part or related statement not in itself against interest. (footnotes omitted).

The Model Code of Evidence (1942) takes a different approach. Rule 509 recommends the acceptance of "a declaration against interest and such additional parts thereof, including matter incorporated by reference, as the judge finds to be so closely connected with the declaration against interest as to be equally trustworthy." The authors of *Weinstein's Evidence* agree.

There is no reason why, when admitting, the court should not explain to the jury the theory upon which this hearsay is being introduced so that it can evaluate more accurately the probative force of the disserving, neutral, and self-serving elements of the statement. The Model Code approach and test is best calculated to carry out the design of the draftsmen of Rule 804(b)(3) to admit trustworthy statements. Cases decided pursuant to Rule 804(b)(3) indicate that the courts are assessing the state-

ment as a whole to determine whether the rationale for the exception is satisfied. (footnotes omitted).

*Weinstein's Evidence, supra,* at 804–138.

 In summary, a trial judge considering the admissibility of a hearsay statement offered as a declaration against penal interest must carefully consider the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, and determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made. The trial judge should then consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted. A statement against interest that survives this analysis, and those related statements so closely connected with it as to be equally trustworthy, are admissible as declarations against interest.

 Applying these criteria to the cases before us, we conclude that Sly's statement should not have been admitted as a declaration against penal interest. Although we agree that the statement tended to subject Sly to criminal liability, we believe the evidence insufficient to prove that a reasonable person in Sly's position would have understood the disserving nature of the statement when he made it. Additionally, we conclude that the totality of circumstances under which the statement was made militate against a finding of the requisite reliability.

The potential criminal liability involved in this case is a form of theft, previously known as the offense of receiving stolen property. Section 342(c) of Art. 27 of the Maryland Code (1957, 1982 Repl.Vol.), a part of our consolidated theft statute, provides:

A person commits the offense of theft if he possesses stolen personal property knowing that it has been stolen, or believing that it has probably been stolen, and [has an intent hostile to the title of the owner or uses the property in a manner that does, or is likely to, deprive the owner of the property].

Sly's statement provided evidence from which a trier of fact could have inferred that Sly purchased the gun believing that it had probably been stolen [4], and from which the trier of fact could have concluded that Sly's intent was hostile to that of the true owner.

As we have indicated, however, the more important question is whether a reasonable person in Sly's position would have understood the disserving nature of the statement when he made it. Even if we assume, without deciding, that the consolidated theft statute enacted in 1979 did not change the law with respect to the level of knowledge needed to prove the charge of receiving stolen property [5], we cannot assume that Sly or any reasonable person in his place would have understood that dealing with property he merely suspected was stolen would subject him to criminal liability. A required element of the common law offense of receiving stolen property was that the defendant receiving

---

**4.** Sly's statement demonstrated that this was a quick street sale, that Sly had heard that the persons from whom he bought the gun were stealing to support their drug habits, and that he paid only $30.00 for the gun. The trier of fact could have concluded from photographs of the shotgun that any reasonable person would have realized the gun had a value far in excess of the sale price (the owner placed its value at somewhere between $270.00 and $500.00). These facts would have supported an inference of a level of knowledge exceeding the mere suspicion to which Sly admitted.

**5.** Section 342(c)(1) of the Code requires proof that a person possessed stolen personal property "knowing that it has been stolen, or believing that it has probably been stolen." Section 340(e) defines "knowing" to mean that a person is practically certain of the existence of the fact in question. Section 341, however, provides that "[c]onduct designated as theft in this subheading constitutes a single crime embracing, among others, the separate crimes heretofore known as ... and receiving stolen property...."

the property had "knowledge" that it was stolen. R. Perkins, *Criminal Law* ch. 4, § 6, 327 (2d ed. 1969). This did not mean, as a lay person might believe, that one had to "know" the property was stolen in order to be guilty. Instead, as Professor Perkins points out:

> If the property is in fact stolen, one who receives it does so with "knowledge" (as this word is used in this connection) if he either (1) knows it to be stolen, or (2) believes it to be stolen, or (3) has his suspicions definitely aroused and refuses to investigate for fear he will discover that it is stolen. (footnotes omitted).

*Id.*, at 327.

Our cases followed this interpretation of the common law, and this Court has consistently held that the State must show "the receiver knew or could reasonably have suspected that the property in his possession was stolen." *McCray v. State*, 236 Md. 9, 16, 202 A.2d 320 (1964); *Weddle v. State*, 228 Md. 98, 103, 178 A.2d 882 (1962); *Bell v. State*, 220 Md. 75, 82, 150 A.2d 908 (1959); *Jordan v. State*, 219 Md. 36, 49, 148 A.2d 292, *cert. denied*, 361 U.S. 849, 80 S.Ct. 105, 4 L.Ed.2d 87 (1959). Again, however, it is not the technical legal meaning of words, nor the judicial gloss that may have been placed upon them that is important—it is the probable understanding of a reasonable person in the position of the declarant. Although Sly provided facts from which one might infer more culpable knowledge, Sly was careful to state that Henry had offered an apparently innocent explanation for his possession of the guns and that Sly only "suspected" the guns were stolen. Moreover, when the police requested a written statement documenting the information he had volunteered orally, Sly stated he "bought [the gun] in good faith and sold it in good faith." Rather than confessing criminal misconduct, these statements appear to represent an attempt to satisfy the police while avoiding criminal involvement.

Had the statement passed muster to this point in our analysis, we would nevertheless reject it upon consideration of other relevant factors bearing on its probable reliability.

Although the police had not informed Sly that he was under arrest at the time of the statement, they had pursued and caught him as he fled from his apartment, and we think it clear that his initial interrogation was "custodial" in the sense that that term is used in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Sly obviously feared the possibility of violation of his parole, and apparently wished to curry favor with the authorities. A motive of personal gain, while not invariably fatal to the presumed reliability of a declaration against penal interest, is an important factor to be considered. Evaluating the totality of the circumstances present in this case, we conclude they militate against a finding that the statement is sufficiently reliable to be admitted for the purpose of inculpating an accused in a criminal case.

Thus, because the statement was not admissible under the sole exception to the hearsay rule through which it was offered, it should have been excluded as a matter of state evidentiary law, and we have no occasion to consider separate issues that are possibly generated by the Confrontation Clause.

JUDGMENTS OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.