776 A.2d 685

Omar WILKERSON

v.

STATE of Maryland.

No. 2044, Sept. Term, 2000.

Court of Special Appeals of Maryland.

July 10, 2001.

558

Michael R. Malloy, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Devy Patterson Russell, Assistant Attorney General, (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for appellee.

Argued before SONNER, CHARLES E. MOYLAN, JR., (Ret'd, Specially Assigned) and RAYMOND G. THIEME, JR., (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

Appellant Omar Wilkerson was tried and convicted of murder and related charges in a jury trial in the Circuit Court for the City of Baltimore. He was sentenced to life for first degree murder, and twenty years consecutive, the first five years without parole, for use of a handgun in a crime of violence. The third count of conviction, for carrying a handgun, was merged with the latter count. Wilkerson appeals and asks:

1. Did the court below err by overruling Wilkerson's objection to the use of "other crimes" evidence regarding robbery of a drug dealer on March 13, 1999?

2. Did the court below err by excluding Prince Broadway–Bey's testimony about Antoine Lucas's alleged admission that he had murdered the victim?

3. Did the court below err by allowing the detective's hearsay testimony about Lakisha Pridgeon's unreliable identification of appellant's photograph when Pridgeon was not present to testify?

To these questions, we answer "no" and explain.

### Facts

Wilkerson was charged with the murder of Shaborn Shabazz Allah on North Avenue in the City of Baltimore on the afternoon of March 5, 1999. He became a suspect on March 13 after police found a handgun, later shown to be the likely murder weapon, in a car he occupied with three others. He was convicted after a four-day trial in which the State presented evidence regarding both the March 13 incident and the homicide itself.

### A

The largest body of evidence at trial pertained to an incident that occurred on March 13, a robbery of a drug dealer in which Wilkerson allegedly participated, along with Prince Broadway–Bey and Antoine Lucas. Police recovered a handgun from the back of the car in which the three were riding; it was found at the foot of the seat in which Lucas had been sitting. On the first day of the trial, Wilkerson objected to admission of any evidence of the robbery, except for the discovery of the handgun itself. The court reserved its ruling.

The next day, prior to the beginning of testimony, the State offered its rationale for admitting the "other crimes" evidence pertaining to the robbery, namely:

i. to show identity, *i.e.*, that the person in possession of the weapon on March 13 also possessed that weapon on March 5;

ii. to show lack of mistake, *i.e.*, that the State had found the right suspect, because that suspect was in possession of the murder weapon; and

iii. that the State needed the evidence of the weapon's use for the robbery to establish Wilkerson's possession of it.[1]

The defense argued for exclusion of this "other crimes" evidence as being unfairly prejudicial, especially after another witness had testified that the murder "looked like, to him, like a robbery gone bad, and then you have the state trying to show there was a robbery a week later involving Mr. Wilkerson." The court rejected this argument:

The testimony is, as proffered, appears to be relevant, certainly on identity and also on what *Solomon v[.] State* refers to [as] assumption of the risk, including when several offenses are so connected in point in time and of time, or circumstances, that one can't fully prove or fully show without proving the other, which I think is the case here.

And the evidence has been proffered for reasons other than to prove the criminal character of the defendant. In other words, it transcends mere evidence of bad character.

The court, however, granted the defense a continuing objection to any testimony related to the March 13 robbery.

Richard Jolley testified about the March 13 incident. On that day, he was hacking, *i.e.*, offering rides in his Pontiac Grand Am in exchange for money. He picked up three men,

---

1. The State argued:

The third is, it doesn't fit within one of the cubby holes but as a catch-all, I don't believe that I can present the evidence of him possessing the weapon without the evidence of how is was being used coming in because it is part and parcel of the testimony of the person being in possession of the object.

(Note that the original transcript is printed in all capital letters. We have altered the capitalization throughout for readability.)

including Wilkerson, who sat in the front passenger seat. One of the men asked Jolley to stop so that he could buy marijuana. Jolley complied, and Wilkerson and the others got out.

Over defense objections, Jolley testified that he saw Wilkerson grab the drug dealer's arm, keeping his other hand in his pocket. The second passenger rummaged through the dealer's pockets. Jolley testified, however, that he saw no weapon brandished during the robbery. When Wilkerson and the others got back into the car, he "gave the boy [sitting behind Jolley] the bag of weed they had took from the guy." Shortly thereafter, police stopped the car and arrested its occupants. In doing so, they found the handgun. The police search was the first time Jolley noticed the gun. Though Jolley was charged in the robbery, the charges were later dropped when it was determined he had not been involved.

Officer Elihea Rushdan of the Housing Authority Police testified that, on March 13 at 5:25 p.m., he was on patrol in the 700 block of Lanvale Street. After a citizen pointed out the Grand Am to him, he and other officers pursued it for three blocks, then successfully stopped it and ordered the occupants out of the car. The front seat passenger ran away. Officer Rushdan chased that passenger, Wilkerson, who eventually hid behind a shed. After ordering the escapee into the open, Officer Rushdan arrested him. The three other persons in the car, Jolley, Broadway–Bey,[2] and Lucas, were also arrested. The officers who searched the car told Officer Rushdan that they found a .38 caliber handgun on the floor of the right rear side of the passenger compartment.

Officer Joseph Green, also of the Housing Authority Police, testified regarding the March 13 incident as well. While on patrol in a marked vehicle with Officer John Ross, Officer Green participated in the stop of the Grand Am and stood guard over the car's other occupants, including Jolley, the driver, Broadway–Bey, the left rear passenger, and Lucas, the

---

2. Broadway–Bey told the officers he was only fifteen years of age, and he was thus taken to a juvenile facility. Later, authorities learned he was eighteen years old.

right rear passenger; during the period in which Wilkerson was fleeing the scene. Officer Green testified that he found the handgun in the Grand Am. He described Wilkerson as standing five feet and five inches tall and weighing 160 pounds. Officer Green also averred that the stop on March 13 was unrelated to the murder investigation pertaining to the incident of March 5.

Officer Christopher Reisanger, also of the Housing Authority Police, testified that he participated in the March 13 stop of the Grand Am. He saw Wilkerson exit the right front seat of the car and flee. Officer Reisanger participated in the chase and arrest of Wilkerson.

Mark Takacs, a firearms expert for the Baltimore City Police Department, testified that two bullets were recovered from the murder scene on March 5 and one from the victim's body. Takacs examined the handgun seized on March 13 and, after firing test rounds and making comparisons, he determined that its rifling characteristics closely resembled those for the seized weapon. He noted that both the seized gun and the murder weapon had the same unusual rifling characteristics.

Kathleen Lundy, a materials analyst for the Federal Bureau of Investigation, testified that she had performed comparative analysis on the three projectiles and three live cartridges she received from the Baltimore City Police Department. She concluded that all six items contained similar lead material and were probably manufactured by Remington Peters. The lead material in one bullet and one projectile was analytically indistinguishable, as was the lead in one bullet and the other two projectiles.

Prince Broadway–Bey testified that, on March 13, he was in the Grand Am with Wilkerson, Lucas, and the driver who was operating his car as a hack for the day. The handgun in the car belonged to Lucas, who normally kept the weapon in his possession. While the robbery was in progress, however, Wilkerson had possession of the gun, and he handed it over to

Lucas just before he got back into the car. Lucas then put the gun under his coat.

## B

As to the homicide on March 5, Officer Scott Davis of the Baltimore City Police Department testified that he responded to the report of a shooting in the 600 block of North Avenue. There, he saw the victim lying face down in the median strip. By the time Officer Davis reached the scene, the victim had no vital signs, and appeared to have died from a single visible bullet wound. The victim was carrying a small quantity of marijuana.

Gregory Stewart, a crime lab technician for the Baltimore City Police Department, testified that he recovered two bullets, one from the victim's back and the other from the ground at the corner of North and Park Avenues. The body was found 88 feet from that corner.

A witness to the shooting, Carl Shifflet, testified that he heard people arguing, then saw one man chase another down the median strip on North Avenue. He then heard three or four popping sounds, and the man being chased fell. The other man turned and ran in the direction from which he came.

Detective Joseph Kleinota of the Baltimore City Police Department testified that another eyewitness, Linmark Pearson, identified Wilkerson from a photographic array on March 26, 1999. That array, he admitted, did not include photographs of the other three occupants of the Grand Am. Over defense objections, the detective was also allowed to testify that Lakisha Pridgeon had viewed the array and told him that she was 60 to 70 percent sure that the photograph of Wilkerson was, in fact, the man she saw on March 5. She could not, however, be positive.

Detective Kleinota also testified that Broadway–Bey had told him that, on March 13, Wilkerson produced a handgun during the robbery. In the car, Wilkerson gave that gun to Lucas, and the weapon was recovered at Lucas's feet.

Linmark Pearson testified that on March 5, at about 3:30 p.m., he was stopped in his vehicle at a red light at the corner of Park and North Avenues. He saw the doors of another car fly open, and then one man got out of that car and ran. Another man got out and, with handgun drawn, chased the runner. The armed man fired several shots at the runner, who then fell in the median strip. The armed man then ran up Park Avenue and cut through some buildings. Pearson identified Wilkerson as the armed man. On cross-examination, however, the defense impeached Pearson's credibility somewhat, because he was forced to admit he had once been placed on probation for failing to disclose a material fact concerning unemployment insurance.

Dr. Jack Titus, assistant medical examiner, testified that he had reviewed the autopsy report pertaining to the victim, which had been written by another medical examiner. The victim was thirty years of age at the time of his death. He suffered three gunshot wounds, one of which lacerated his lung and heart, causing his death. A projectile was recovered from the victim's body, and police found another at the scene of the shooting.

## C

After Dr. Titus testified, the prosecution rested its case, and the defense began its presentation. First, it proffered potentially exculpatory testimony by Prince Broadway–Bey, one of the passengers in Jolley's Grand Am on March 13. Out of the presence of the jury, Broadway–Bey testified that, between March 9 and March 13, Lucas had admitted to him that he, and not Wilkerson, had committed the murder. Lucas showed Broadway–Bey the handgun. He described Lucas's statement in the following colloquy with the defense counsel:

Q: Where did he tell you this?

A: When he was up at his house.

Q: What were his exact words if you can remember?

A: I don't remember. We was up there smoking. All I know is he told me what happened though.

Q: What did he tell you, do you remember?

A: He told me he was robbing a boy and the boy got out and ran and he started shooting him.

The State argued against admitting this statement against penal interest, and defense counsel argued vociferously for admitting Broadway–Bey's full testimony, including this statement. The court found the evidence to be inadmissible. Although Lucas was unavailable to testify, it determined that the statement was insufficiently trustworthy to be admissible.

Wilkerson next called two witnesses on his behalf, both of whom were near the scene of the March 5 murder at the time it occurred. First, Sederick Vander–Bey testified that Wilkerson was with him when the shots rang out. Second, Albert Clark testified that Wilkerson, who he knows by sight, was sitting with Vander–Bey in a small shopping mall off North Avenue. Although Clark was not with Wilkerson and Vander–Bey at the time he heard shots, he recalled that only a few seconds elapsed from the time he saw the men until he heard the gunfire.

Additionally, Kevin Blackmon testified on behalf of Wilkerson. Blackmon had been an inmate in the Baltimore City Detention Center during the eight-month period after May 1999. He frequently conversed with Lucas, who was in a cell across the hall, and he testified as follows regarding those conversations:

Q: Can you tell the members of the jury what if anything Mr. Lucas said that you found to be unusual?

A: He told me that he was involved in a murder that he said he committed a murder that this defendant right here, that he didn't nothing to do with. He said he did it. That's what he told me.

Q: How many times did Mr. Lucas mention this to you?

A: Plenty times.

Q: Can you tell the jury what details Mr. Lucas gave you about the particular homicide?

A: He said it was broad daylight, it was an attempted robbery and he chased the victim down and slot [*sic* ] him in broad daylight in the middle of the median strip.

Q: Did he tell you where approximately this happened?

A: He said it was Park Avenue and North Avenue. Park and North Avenue.

Q: Again, how many times did he mention this to you?

A: Countless times.

Wilkerson also testified on his own behalf. He stated that, on March 5 at 3:30 p.m., he was with Vander–Bey and Tatem Cloud in a parking lot near the stores where Clark claimed to have seen him. Numerous other persons were in the area. He heard shots from North Avenue and walked towards that street with his companions to investigate. He said that the police were arriving on the scene when he got there. Wilkerson denied shooting the victim; in fact, he claimed never to have seen the victim at all. He also denied being in possession of the handgun on March 13, explaining that the gun belonged to Lucas.

After the defense rested, the court denied Wilkerson's motion for judgment of acquittal.

## Discussion

### I

Wilkerson's first issue on appeal is whether the court below erred by admitting evidence regarding robbery of a drug dealer on March 13, 1999. Wilkerson challenges the admissibility of this evidence under the evidentiary rules regarding other crimes or "bad acts." During trial, the court granted him a continuing objection regarding this testimony.

Admissibility of other crimes or bad acts evidence, other than for impeachment purposes, is governed by evidentiary principles that are currently embodied in Maryland Rule 5–404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

In allowing for the admissibility of such evidence, we walk a fine line between evidence that would explain commonalities and seeming coincidences and evidence that would lead the jury to convict someone because "once a criminal, always a criminal." Our rule seeks to encourage the former and prevent the latter. Indeed, " 'the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is introduced for some purpose other than to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial.' " *Streater v. State*, 352 Md. 800, 806, 724 A.2d 111 (1999) (quoting John W. Strong, *McCormick on Evidence* § 190 (4th ed.1992)).

In situations where evidence of other crimes or bad acts might be admissible, Maryland courts have set forth a three-prong test whereby we determine whether such evidence comes in:

i. The court first determines whether the evidence fits within one or more of the special relevancy exceptions in the rule, *e.g.*, does the evidence show motive, opportunity, intent, or the like. This is a legal test, and involves no exercise of discretion by the trial court.

ii. If one of the special relevancy exceptions applies, then the court determines whether the accused's involvement in the other crimes is established by clear and convincing evidence.

iii. If the evidence is both relevant and likely to be true, then the court determines whether the prejudicial effect of admission outweighs the probative value. If not, the court will allow the evidence to be presented. This step is matter of discretion for the court and will not be disturbed on appeal unless clearly abused.

*See Streater,* 352 Md. at 807–08, 724 A.2d 111; *Terry v. State,* 332 Md. 329, 335, 631 A.2d 424 (1993); *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896 (1989). Our courts scrutinize evidence pertaining to other crimes and bad acts carefully to guard against the danger of misuse and to avoid the risk that such evidence will be used improperly by the jury against the defendant. *See Streater,* 352 Md. at 806–11, 724 A.2d 111 (citing several cases exemplifying application of this rule, including *Ayers v. State,* 335 Md. 602, 632, 645 A.2d 22 (1994); *Straughn v. State,* 297 Md. 329, 333–34, 465 A.2d 1166 (1983); *Faulkner,* 314 Md. at 635, 552 A.2d 896; *Ross v. State,* 276 Md. 664, 671, 350 A.2d 680 (1976); *Cross v. State,* 282 Md. 468, 474, 386 A.2d 757 (1978)).

█ Thus, as a general rule, "evidence of a defendant's prior criminal acts *may not* be introduced to prove guilt of the offense for which the defendant is on trial." *Holmes v. State,* 119 Md.App. 518, 529, 705 A.2d 118 (1998) (quoting *Ayers,* 335 Md. at 630, 645 A.2d 22) (emphasis added). The exception to this rule, however, allows evidence of a defendant's prior acts if "it is substantially relevant to some contested issue in the case and if it is not offered to prove the defendant's guilt based on a propensity to commit crime or his character as a criminal." *Faulkner,* 314 Md. at 634, 552 A.2d 896. In other words, the evidence offered must have "special relevance." *Terry,* 332 Md. at 334, 631 A.2d 424 (quoting *Harris v. State,* 324 Md. 490, 500, 597 A.2d 956 (1991)); *Holmes,* 119 Md.App. at 530, 705 A.2d 118 ("Evidence of other crimes may be admitted if it 'is substantially relevant to some contested issue in the case and if it is not offered to prove the defendant's guilt based on propensity to commit crime or his character as a criminal.' Stated differently, evidence of prior bad acts is admissible if it has 'special relevance'.[*sic* ]") (quoting *Ayers,* 335 Md. at 631, 645 A.2d 22).

█ Here, Wilkerson's objection did not center around the entire account of the events of March 13, but only pertained to the robbery that took place. For the defense, the traffic stop was a neutral event, and the recovery of a handgun at the feet

of Antoine Lucas went in Wilkerson's favor. Evidence came in to show that the gun belonged to Lucas, thus creating an opportunity for the jury to infer reasonable doubt. The defense, however, sought to extricate the finding of the gun from its broader context and "sanitize it somewhat so that you get his possession of the gun without the robbery." The State argued that such wordplay was both transparent and futile, for the other crimes evidence showed lack of mistake and identity and thus had special relevance under Rule 5–404(b). The defense, as expected, countered that the prejudicial effect would outweigh the probative value of relating the full account of the events of March 13. The court found that the evidence was admissible as proffered because it "appear[ed] to be relevant, certainly on identity and also on what *Solomon v. State*[3] refers to assumption of the risk, including when several

---

3. In *Solomon*, Judge Moylan sets forth extensive analysis of special relevance, showing the breadth of admissibility under Rule 5–404(b):

> On any list of the representative or illustrative types of issues that have regularly been found to possess substantial relevance, the first rank invariably consists of the quintet brought to the front of the mind by the mnemonic aid MIMIC:
> 1. MOTIVE
> 2. INTENT
> 3. Absence of MISTAKE or accident
> 4. IDENTITY
> 5. COMMON scheme or plan
>
> Those five, however, are by no means the only entries one finds even on the most ordinary of listings. Without benefit of mnemonic device, some of the other "regulars" are:
> 6. *When several offenses are so connected in point of time or circumstances that one cannot be fully shown without proving the other.*
> 7. Where the "other crime" tends to show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial.
> 8. "[P]rior criminal conduct ... may be admitted ... to show consciousness of guilt."
> 9. "[O]ther like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused." Whereas *Ross[ v. State,* 276 Md. 664, 670, 350 A.2d 680 (1976),]treats this use of a peculiar *modus operandi* or "signature" as an exception in its own right, *State v. Faulkner,* 314 Md. [630,] 638–640, 552 A.2d [896 (1989) ], treats it merely as a variety or aspect of the "identity" exception. This minor difference of opin-

offenses are so connected ... in time ... or circumstance, that one can't [be] fully prove[n] or fully show[n] without proving the other."

*The court's determination under the standard for Rule 5-404(b) was proper.* In keeping with the first prong of the test, the evidence as a matter of law would establish Wilkerson's identity and lack of mistake, because as the person in possession of the weapon during the robbery on March 13, he may have also been in possession of the murder weapon as part of a similar scenario eight days earlier. Jolley's whole testimony was critical to this point. It contradicted Broadway–Bey's contention that the gun belonged to and remained in the possession of Lucas during the robbery, and presumably earlier. Defense counsel admitted as much when he sought to circumscribe evidence about the gun in a way that fingered Antoine Lucas:

> Your Honor, I understand the State's position. I do want facts about how the gun was recovered into evidence. In fact, the officer who recovered the gun is under subpoena to me as well as the State. It will come as no surprise to the State we have talked about this numerous times. In fact, every time we run into each other, we get in a sentence or two about it.

> But I'm pointing the finger of responsibility at Mr. Antoine Lucas for the offense. So, therefore, I do want the evidence to come in as to where the gun was recovered because it was recovered at his feet.

---

ion in conceptualization makes the larger point—that it is relevant evidence on a material issue in any event, regardless of how one categorizes or conceptualizes it.

With the passing years, the list of representative examples continues to grow. Taking their cue from Federal Rule of Evidence 404(b), the recent cases now routinely list as recognized exceptions:

10. Opportunity
11. Preparation
12. Plan
13. Knowledge

*Solomon v. State,* 101 Md.App. 331, 353–55, 646 A.2d 1064 (1994) (citations omitted) (emphasis added).

As for the second prong of the test, no one questions the fact that Wilkerson participated in the robbery on March 13. The defense does seek to argue abuse of discretion on the third prong, that the prejudicial effect of such testimony outweighs its probative force. The court's invocation of *Solomon, see supra* note 3, notwithstanding, there was no credible evidence introduced at trial that the victim died as a result of a robbery gone bad, and thus Wilkerson's claim that "[t]he robbery evidence was extraordinarily prejudicial to Appellant" because "[i]t probably led the jury to conclude that, if Appellant had robbed a drug dealer on March 13, he had probably been trying to commit a similar crime on March 5." Witnesses to the March 5 shooting, however, did not give accounts similar to that of Jolley. Instead, accounts of the shooting by eyewitnesses Shifflet and Pearson describe a disagreement among acquaintances that escalated to violence, not the robbery of a drug dealer who resisted and paid with his life. Neither did the State mention robbery as a motive for the March 5 shooting during its opening statement or summation. Notably, the *only* witness that addressed robbery as motive for the murder was Blackmon, who was called *by the defense.*

Moreover, in putting on the witnesses it wanted to help make its case, the State sought to avoid prejudice and hewed to both the letter and spirit of Rule 5–404(b), eliciting evidence of identity and lack of mistake, and not, we note, seeking to imply that the robbery of March 13 replayed a robbery on March 5. For example, although officers of the Housing Authority Police testified as to the traffic stop and arrest of Wilkerson and his companions, those officers did not state why they stopped the Grand Am in the first place. The heart of their circumscribed testimony was the recovery of the handgun and Wilkerson's flight and capture. Likewise, Broadway–Bey simply testified that he was in the same car as Wilkerson when police stopped that car. He also testified that Wilkerson fled the car and police searched the vehicle and found the handgun. During his testimony, Broadway–Bey claimed that the gun belonged to Lucas.

Jolley's testimony regarding the events of March 13 implies that a robbery took place that day; however, he was unclear as to the participation of Wilkerson and whether he was armed:

Q: Now, when you had these three men in your car did they direct you to a particular location? ...

A: First they said carry me on the west side, right.

Q: Did you?

A: Yes, and then on the way there, they say, hey man, it is all right I stop and buy a bag of weed.

THE COURT: I'm sorry, I didn't hear.

A: He said, is it all right I stop and buy a bag of weed. I said, sure, I don't care. Like that, right.

THE COURT: Stop by where?

A: Stop to buy a bag of weed.

THE COURT: B[u]y a bag of?

A: Weed.

THE COURT: Weed? Okay.

Q: Now, did they tell you where to turn and where to go?

A: Yes. I was going, you know, where they say turn, where they say go because that particular area I didn't know nothing about....

Q: When they stopped—when you stopped by that person did anybody get out of the car?

A: Yes.

Q: Did the gentleman at the trial table get out of the car?

A: Yes.

Q: What did he do after he got out of the car?

A: He's he well first he walked around the side, on the pickup, and the other guy behind me, he got out. So I looked out—I looked over and then looked back and I seen—[whereupon defense counsel objects and the court overrules that objection]

Q: You said that the person at the trial table got out and then another person in the car got out.

A: Yes....

Q: You saw the two guys that got out of the car do what?

A: Well, when I turned around and looked, one of them had the guy by the arm and the other one was going in his pocket.

Q: The one who had the guy by the arm, who was that?

A: The defendant....

Q: Now, what if anything did you see that lead you—might lead you to believe the defendant had a weapon? ...

A: Well, he had the guy by his arm and he had his hand in his pocket.

Q: When you saw him in that position, did you draw a conclusion from that?

A: I was think, ah, man, they're robbing this guy like that. That is what I was saying to myself.

Q: Why did you think he had his hand in his pocket?

A: He had his hand in his jacket pocket. Had one hand on him like holding his arm and the other hand in his jacket pocket. The other guy was going through his pants pocket.

Q: Did you ever see a weapon?

A: No.

Q: Besides him having his hand in his pocket, did you see anything that made you think that anybody who had been in your car or was in your car had a weapon?

A: Really, I didn't know nothing about a weapon until the police walked over.

In appealing the issue *sub judice*, Wilkerson speaks from both sides of his mouth. On one hand, he argues that the court did not err when it admitted evidence regarding the police discovery of the handgun on March 13, hoping that such evidence would implicate Antoine Lucas. On the other, he seeks to eradicate all context for such testimony as prejudicial. He also argues that the March 5 shooting resulted from a botched robbery attempt, yet he blanches at the thought that the jury—even without prosecutorial assistance—could link the testimony involving the later incident to the earlier one. He cannot have it both ways. We affirm.

## II

Wilkerson next contends that the court below erred by excluding Broadway–Bey's testimony regarding Antoine Lucas's alleged admission that he had murdered the victim during a failed robbery attempt. Lucas' statement, he contends, qualifies as a statement against penal interest under Maryland Rule 5–804(b)(3)[4] and must be admitted, because Lucas was without question unavailable to testify and at risk of being found guilty of a crime. The statement fails, however, under the third element of the test for admissibility, evaluation of its trustworthiness.

Because the statement tends to inculpate Lucas while it tends to exculpate Wilkerson, "corroborating circumstances [must] clearly indicate the trustworthiness of the statement." Md. Rule 5–804(b)(3); *see also State v. Matusky,* 343 Md. 467, 481–82, 682 A.2d 694 (1996); *State v. Standifur,* 310 Md. 3, 17, 526 A.2d 955 (1987). "[T]he burden is on the proponent 'to establish that it is cloaked with indicia of reliability ... [which] means that there must be a showing of particularized guarantees of trustworthiness.'" *West v. State,* 124 Md.App. 147, 167, 720 A.2d 1253 (1998) (quoting *Simmons v. State,* 333 Md. 547, 560, 636 A.2d 463 (1994)) (citations omitted). The court below had the duty of evaluating whether the statement was trustworthy, which is a factual determination. *See, e.g., Standifur,* 310 Md. at 19–20, 526 A.2d 955; *see also Powell v. State,* 324 Md. 441, 453, 597 A.2d 479 (1991).

---

4. Rule 5–804(b)(3) states:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness ...

(3) Statement Against Interest. A statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest, so tended to subject the declarant to civil or criminal liability, or so tended to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

That is to say, it was within the court's discretion to determine whether the evidence was sufficiently reliable for admissibility. *West*, 124 Md.App. at 166, 720 A.2d 1253; *see also Jacobs v. State*, 45 Md.App. 634, 653, 415 A.2d 590 (1980) ("[w]hen dealing with the rule against hearsay and its exceptions ... admissibility is a question addressed exclusively to the discretion of the trial judge").

In assessing trustworthiness, the court takes into account a variety of considerations:

In summary, a trial judge considering the admissibility of a hearsay statement offered as a declaration against penal interest must carefully consider the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, and determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made. The trial judge should then consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted. A statement against interest that survives this analysis, and those related statements so closely connected with it as to be equally trustworthy, are admissible as declarations against interest.

*Standifur*, 310 Md. at 17, 526 A.2d 955.

Here, the following colloquy took place as between defense counsel and Broadway–Bey during the proffer of testimony regarding Lucas's alleged statement against penal interest:

Q: Mr. Broadway–Bey, has anyone, since the time you came home or since March—

THE COURT: Louder, Sir.

Q: Since March 5th 1999, has anyone made a statement to you claiming responsibility for the murder that happened at North Avenue and Park Avenue on March 5th?

A: Yes, I heard rumors.

Q: Has anyone—not rumors but has anyone in any conversation told you that they did the murder?

A: Yes.

Q: Who was that?

A: A lot of people. Like telling me what happened?

Q: No. Let me rephrase the question. Excluding rumors, excluding not counting anything that anybody told you about what they heard or what they saw, has anyone told you, for example, I'm the one who killed the man down on North Avenue and Park Avenue. Has anyone made any statement to you saying they, himself, were the ones who committed the crime?

A: Yes.

Q: Who is that?

A: Antoine.

Q: When did he make that statement to you?

A: I don't remember.

Q: Was it shortly after you came home, around the time you came home, before you went to D.O.C.

A: That was after I came home.

Q: Was it after you were arrested together on the 13th?

A: No, before that.

Q: You were home about four days before you were arrested?

A: Right.

Q: Who told you sometime during that four day period that he is the one who did the murder?

A: Yes.

Q: Where did he tell you this?

A: When he was up at his house.

Q: What were his exact words if you can remember?

A: I don't remember. We was up there smoking. All I know is that he told me what happened though.

Q: What did he tell you, do you remember?

A: He told me he was robbing a boy and the boy got out and ran and he started shooting him.

Q: Had you read about that in the newspaper or anything like that?

A: Yes, I seen it on the news.

Q: And when you say you all were smoking together, smoking marijuana together?

A: Yes.

Q: And would you and Antoine share secrets amongst each other as friends do?

A: Yes.

Q: Did you trust him with your secrets and did he trust you with his secrets?

A: Yes.

(Whereupon, there was a pause in the proceedings.)

Q: No further questions.

The court below found that, during the foregoing colloquy, the defense failed, as the proponent of proffered evidence, to meet its burden to show the statement's trustworthiness, in large part because Broadway–Bey had to be coached on the stand during the proffer: "I think we were all present when the light went on in his head and could see him then have a recollection, as you indicated, of the statement given by [Lucas] to him. I find that the going and grasping until hit upon the admission as an indication of lack of trustworthiness of the statement." The court also pointed to the fact that the declarant and witnesses were smoking marijuana—a mood-altering substance—during the conversation affected the trustworthiness of the information relayed therein. We agree. It is clear to us that counsel was fishing for a certain result, and cast and recast his net upon the waters until Broadway–Bey, somewhat reluctantly, uttered the operative words regarding an incident he vaguely recalled through the haze of

marijuana smoke. Such would not satisfy us as to trustworthiness of his statement, and we find no abuse of discretion.

■■■ Even if the court had abused its discretion, failure to admit Broadway–Bey's testimony hardly constitutes reversible error. The defense was allowed to set forth its theory via the testimony of Kevin Blackmon, who claimed that Lucas told him "numerous times" that he had committed the murder and that Wilkerson had nothing to do with it. Accordingly, though the testimony of another witness, Wilkerson was able to adduce evidence that Lucas had confessed to the murder. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976). There is no merit to Wilkerson's contention that Blackmon was a garden variety jailhouse snitch, while Broadway–Bey was a friend. Both were impeachable witnesses otherwise known to the criminal justice system. Wilkerson presents no grounds for relief and we thus affirm.

### III

■■■ Wilkerson's final argument on appeal is that the court erred when it admitted the testimony of Detective Joseph Kleinota regarding Lakisha Pridgeon's hesitant identification of appellant's photograph. Lakisha witnessed the March 5 incident, but she became distracted in her efforts to dial her cellular telephone and seek help. Thus, she told Detective Kleinota she could not be completely sure that Wilkerson, whom she identified in a photo array, was the shooter. Lakisha was hospitalized and thus unavailable to testify at Wilkerson's trial, but during her meeting with Detective Kleinota, she had written on the back of the photo array: "On my account, I would say that the young man I identified is about 60 to 70 percent of my remembrance. Lakisha Pridgeon." Over defense objections, Detective Kleinota testified that Lakisha and her sister Takisha appeared at the police station and viewed the photo array. He also was allowed to present Lakisha's written reaction to the array. Wilkerson now argues that Detective Kleinota's testimony was inadmissible hearsay, because Lakisha herself did not testify. *See Tyler v.*

*State,* 342 Md. 766, 780, 679 A.2d 1127 (1996) ("In any event, the inability of Tyler to cross-examine Eiland rules out admissibility under the pre-trial identification hearsay exception. *The prior identification exception to the hearsay rule* [*see* Md. Rule 5–802.1(c) ] *has the same cross-examination requirement as the prior inconsistent statement exception: the declarant must be available for cross-examination at the trial where the prior identification is admitted.*") (citing *Nance v. State,* 331 Md. 549, 560, 629 A.2d 633 (1993); *Bedford v. State,* 293 Md. 172, 176–177, 443 A.2d 78 (1982)) (emphasis added); *see also* Md. Rule 5–802.1(c) ("The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule . . . (c) A statement that is one of identification of a person made after perceiving the person").

Wilkerson, however, did not preserve this issue on appeal. The trial transcript shows that the *only* basis for his objection to Detective Kleinota's testimony was its reliability—that Lakisha was only able to state that she had been 60 to 70 percent sure of her identification:

> [DEFENSE COUNSEL]: Your Honor, the basis for my objection is that, in my opinion, Lakisha was not able to make an identification of Mr. Wilkerson because she said that she was only 60 percent certain that this was the person. I don't think that, talking about reliability, if she is 60 percent, she's 40 percent uncertain. And that certainly is not reliable evidence and should not be allowed—the jury should not be allowed to consider that because I don't think that counts as an identification when you say possibly, possibly not.
>
> THE COURT: All right.
>
> [ASSISTANT STATE'S ATTORNEY]: It is still a statement regarding identification. That goes to the weight. My recollection is she was 60 to 70 percent. I could be wrong about that it may be 60, but I thought it was 60 to 70 percent.

THE COURT: You'll get the witness on recross. Overrruled.

The only point at which defense counsel noted that Lakisha herself had not been subject to cross-examination was during his motion for a new trial. That mention alone was insufficient to preserve the issue. Accordingly, Wilkerson's third issue on appeal was waived. *See Walker v. State,* 338 Md. 253, 262, 658 A.2d 239 (1995), ("We ordinarily will not review an issue that was not presented to the trial court."); *Banks v. State,* 84 Md.App. 582, 588, 581 A.2d 439 (1990) ("Although not required, when the grounds for an objection are stated by the objecting party ... only those specifically stated are preserved for appellate review; those not stated are deemed waived."). We affirm.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**