827 A.2d 850

Charles Henry STEWART, Jr.

v.

STATE of Maryland.

No. 2594, Sept. Term, 2001.

Court of Special Appeals of Maryland.

June 26, 2003.

426

Mararet L. Lanier, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Submitted before HOLLANDER, SALMON, and EYLER, JAMES R., JJ.

HOLLANDER, J.

In this murder and assault case, in which both a father and son were charged but tried separately, we are asked to consider whether the trial court erred at the son's trial by refusing to admit as a declaration against penal interest the father's statement exculpating the son. Following a trial in June 2002, appellant Charles Stewart, Jr. (sometimes referred to as "Junior" or "Nookie"), was convicted by a jury in the Circuit Court for St. Mary's County of numerous offenses, including first degree murder of John Butler, use of a handgun in a crime of violence, first degree assault of Omega Nunley, second degree assault of John Nunley, and related charges. Appellant was sentenced to life imprisonment for the murder conviction, and a consecutive term of thirty-five years for the other convictions.[1]

On appeal, appellant presents two questions for our consideration, which we have rephrased slightly:

I. Did the trial court err in excluding a declaration against penal interest made by appellant's father,

---

1. At a bench trial in September 2001, appellant's father was convicted of second degree murder, two counts of attempted second degree murder, and related offenses. We recently affirmed those convictions in an unreported opinion. *See Charles Stewart, Sr. v. State,* No.2086, September Term, 2001 (filed June 20, 2003).

Charles Stewart Sr., in which Stewart, Sr., implicated himself and exculpated appellant?

II. Did the trial court abuse its discretion in permitting the State to re-open its case at the suppression hearing?

For the reasons discussed below, we shall affirm.

## FACTUAL SUMMARY[2]

On March 5, 2001, Deputy Clayton Safford of the St. Mary's County Sheriff's Office responded to a call for a shooting and found the deceased victim, John Butler ("Fats"), lying on Pegg Road, near the Pegg's View Apartments. Within two to three feet of Butler's body, Deputy Safford located a kitchen knife. John Nunley ("Snowman") and Omega Nunley ("Megatron") were found a short distance away. Both had been severely beaten but were still alive.

At the scene, Deputy First Class Mark Beckman found an unfired bullet and a shell casing in the gutter. In front of the apartments, he observed a puddle of blood, a live bullet, and a set of keys. Deputy Thomas Hedderich, the third officer to arrive at the scene, described the appearance of the Nunley brothers:

[T]hey were both laying on the ground in the area of the apartments on the grass. Both of them were swollen, bleeding, cuts about the head and face. And they was just laying there. I asked them if you are all right, are you all right. I got no response, however, their eyes were opened, they were breathing, they were moving around, trying to get up. . . . I noticed a lot of blood, a lot of eyes swollen almost shut, things like that.

James Locke, M.D., an assistant medical examiner, testified as an expert in forensic pathology. He opined that Butler, who was twenty-seven, died as a result of a gunshot wound to the back of the neck. The bullet severed the spinal cord,

---

2. Because a number of the witnesses have identical last names, we shall sometimes refer to the witnesses by their first names or nicknames.

passed through the floor of the mouth, and lodged in the victim's right cheek. A large caliber metal jacketed bullet was recovered from the cheek. Butler also suffered abrasions to his face, left hand, and right shoulder.

Gerald Apollon, M.D., an emergency room physician at St. Mary's Hospital, testified that on the morning in question he treated both John and Omega Nunley. A CT scan revealed that John "had fractures of the skull and also bleeding around the brain as well as within the brain." Because of the life threatening injuries, John was transferred to Washington Hospital Center. A drug screening indicated that John was intoxicated.

John was hospitalized for about three months as a result of the injuries he sustained. A photograph of John, depicting his condition, was admitted into evidence. With regard to John's current condition, his mother, Joanne Nunley, testified:

At the moment he had to start back over again to know his ABCs, his colors, his—it's just like first grade in the way of speaking. He got to learn everything back over again. We are teaching him to know his ABCs, his times. And he had forty stitches in his head. He's going to therapy twice a week now for ... his right arm, and to learn how to move his arm the right way. And he just, like—I mean, like he know who you are, but he cannot say your name and everything. He just had to start all over again from the beginning as a child.

According to Dr. Apollon, Omega "had some obvious injuries. He had a lot of swelling" and "lacerations." In addition, a CT scan revealed that Omega had a fracture of the right eye socket, fractures of the skull, and bleeding around the brain. As a result, Omega was transferred to Shock Trauma. He tested positive for cocaine, marijuana, and an intoxicating level of alcohol.

Omega testified that he did not remember what happened on March 4 or March 5 of 2001. He recalled only that his brother picked him up that day and they "went down to Butler's." He added: "[A]fter that I don't remember noth-

ing...." Omega was hospitalized for about two months as a result of his injuries, and suffered the loss of eighty percent of the vision in his right eye. He continues to experience headaches and pain in his legs and back.

John Barnes was with appellant and his father on the evening of March 4 and the morning of March 5, 2001. He testified that in the late hours of March 4, he was at home when appellant and his father, Charles Stewart, Sr. ("Senior"), stopped by to ask him if he wanted to go out. Barnes's brother-in-law, William Somerville, was also present. Senior drove them in his gray, four-door Oldsmobile to a "club" called Butler's Place in Lexington Park.

According to Barnes, the group arrived at Butler's Place shortly after midnight on March 5, 2001, where they drank beer and danced. As the morning wore on, more patrons arrived and people were crowding the dance floor. Barnes testified: "I just saw Charles, Jr., and Fats [i.e., the victim] like face-to-face talking or whatever. I didn't really pay it no mind. Then it was just a little scuffle had broke out, and they broke everything up, and we left out of there." Barnes claimed that they were "[p]ushing and shoving" and then "Fats tried to pick [appellant] up by his legs, and somehow or another they fell down on the floor, then everybody just broke them up." Barnes believed that Senior was also involved in the altercation.

Appellant struck the bouncer who forced him to leave the club. Barnes and Somerville told appellant, "[L]et's go home, kill it, don't worry about it." When Senior exited the establishment, appellant was still upset. At appellant's suggestion, they drove to the home of appellant's friend, Stuart Gough. Appellant and Senior went inside. When Barnes went inside to use the bathroom, he saw appellant with a handgun and Gough with a plastic bag. Thereafter, Robert Scriber, Benjamin Hebb, and Nathan Schindler all arrived in Schindler's Ford Bronco.

Upon leaving Gough's residence, Barnes, Gough, and Junior entered Senior's car; Sommerville went with the group in the

Bronco. Barnes assumed that they were going to get gas and then go home. He apparently "dozed off" and, when he awoke, they were heading back to Butler's Place. At appellant's direction, Senior went inside. He determined that no one was present.

The group then proceeded to Church's Chicken to get gas. While there, Barnes went inside to use the restroom and, when he exited, the Bronco pulled up. Barnes still thought they were going home, but he was wrong. He explained: "And right when we get up on the turn by Pegg Road, they decided they want to turn up" into the Pegg's View apartment complex. According to Barnes, it was appellant who stated, "turn on Pegg's View." Schindler followed, driving the Bronco. Shortly after the two vehicles parked at the apartment complex, Barnes observed a black Ford Taurus come around the corner, "real fast," driven by John Nunley. Appellant and Senior immediately "jump[ed]" out of the car and ran to the Taurus. Barnes also recalled that Somerville, Scriber, and Hebb exited the Bronco, but he could not remember if Schindler got out.

From inside the vehicle, Barnes saw that Senior was "holding" an aluminum baseball bat. According to Barnes, "[t]he tip of the bat" was "coming down repeatedly." Barnes "could hear a little bit of noise," which he described as "a pinging sound." He "figure[d]" the noise came from the bat. Then, Barnes saw Butler exit the apartment building and walk toward the commotion. Barnes heard someone yell, "It wasn't me." At that point, Barnes decided he "was going to try to get out [of] the car, get away from there." It was then that Barnes heard a gunshot. Barnes did not know who had the gun, and he quickly "jumped in the car" because he was "scared." Gough returned to the car and moved it a short distance to another parking place.

Appellant and Senior ran back to the car; Senior was carrying the bat. While in the car, Barnes saw appellant hand a small black gun to Gough. He also heard appellant say that he had to "go get rid of the stuff." When the group arrived at

Lexwood Apartments, Senior "jump[ed] out real fast, ran towards the wooded area[,]" and threw the bat in the woods. Gough also ran into the woods, but headed in a different direction from Senior. When they returned to the car, Barnes thought it was Senior who stated: "[N]obody know nothing." Barnes was then dropped off at his home.

At about 5:00 a.m., the police came to Barnes's house and transported him to the police station, where he was interviewed by Detective David Yingling. Later, the detective informed Barnes that his story was not consistent with other information that had been obtained. According to Barnes, Detective Yingling told him to "just get it straight, get it right," so Barnes "gave him the truth." Barnes explained that he did not tell the truth initially because he was frightened.

On cross-examination, Barnes agreed that he was somewhat "confused" about "the details." In one of his statements on March 5, for example, he had indicated that he saw Gough hand his gun to Senior, but he acknowledged at trial that he was "not sure" if that was accurate. Nor did he know who had the gun when the group returned to Senior's car at Pegg's View. He also acknowledged that, at the scene, he was in the car with his head down, and so he "missed a lot of the details there."

On redirect, Barnes claimed that appellant had the gun at Gough's house. Moreover, when asked if he was "absolutely sure" that appellant had the gun, Barnes responded, "yes." In addition, Barnes said that he first saw the bat at Pegg's View, and claimed that Senior had it and used it. Barnes stated: "I just seen the tip of the bat just coming up, coming down." And, according to Barnes, when Senior and appellant ran to the car, Senior was carrying the bat. He also reiterated that, while in the car, he saw appellant "handing [the gun] over . . . [to] Gough."

On re-cross, the defense attorney reviewed Barnes's statement to the police on March 5, 2001. In that statement, Barnes indicated that Gough said he wanted to bring his "piece." Barnes understood that term to mean that Gough

wanted to bring his gun. In addition, Barnes had said that, while the group was at Gough's residence, Gough retrieved a bag. Apparently, the gun was in the bag, and Barnes stated that the bag was handed to Senior.

Detective First Class David Yingling testified that, at approximately 10:45 a.m. on the morning of the occurrence, Barnes took him to the area in question and pointed out where the bat had been thrown. Yingling recovered a baseball bat from a wooded area on Lexwood Drive. Detective Yingling also found one RP .380 round from Gough's residence.

On March 8, 2001, Detective Yingling located a black Davis .380 semiautomatic handgun in the woods near Lexwood Drive. It had one live round in the clip and one in the chamber. The detective estimated a distance of 75 to 100 yards separated the places where the gun and bat were found.

Gary Dicks, a crime lab technician with the St. Mary's County Sheriff's Office, arrived at the scene of the shooting at about 3:00 a.m. An expended round was found near Butler's body. Dicks also attended the autopsy of John Butler; a bullet was retrieved from his body. Although a fingerprint was recovered from the knife found near Butler's body, Dicks indicated that it was not readable. No fingerprints were recovered from the handgun or the shell casing, and the bat also tested negative for fingerprints and blood.

Gary Phillips, a firearms examiner, testified that the expended shell casing recovered near Butler's body, and the bullet recovered from his body, were fired from the handgun found by Detective Yingling. According to Detective David Alexander of the St. Mary's Sheriff's Office, the handgun was registered to an elderly woman who had no connection to anyone in this case.

Numerous other witnesses testified for the State, including Benjamin Hebb, Robert Scriber (Senior's nephew and appellant's cousin); William Somerville (a relative of the Stewarts and John Barnes); Steven Maddox (the bouncer and cousin of the decedent); Rufus Butler, the owner of the club; Katrina Fenwick, the decedent's girlfriend; and Kevin Barnes, the

decedent's friend. Because their testimony was largely consistent with that of John Barnes, we shall only recount select portions.

According to Hebb, appellant and Senior confronted the Nunleys at Pegg's View. Then, he "heard somebody hit something, and it's like ting, and you heard that." At that point, Butler came outside. Hebb stated: "He [i.e., Butler] went down there, and no sooner he went down there, you just heard a pow."

Scriber recalled that Butler and Junior exchanged words on the dance floor at Butler's Place. He stated: "Butler started throwing elbows, and he was hitting Junior with them, and then something happened. I think he pushed Nookie, and then they start the fighting, and then they broke it up...." According to Scriber, Butler also tried to slam Junior to the ground. Scriber did not see the Nunleys join the fight. At Pegg's View, Scriber saw appellant hit someone. He also saw Senior with a bat and heard sounds "[j]ust like metal hitting concrete." Scriber also saw Butler and Kevin Barnes approach the scene. As Butler ran behind a building, appellant and Senior pursued him. Then, Scriber heard a gunshot.

Kevin Barnes [3] testified that he, his girlfriend, Katina Jenkins, Butler, and Butler's girlfriend, Katrina Fenwick, were at Butler's Place when a fight broke out between Butler and the Stewarts. According to Barnes, Senior displayed a knife during the fight. Barnes claimed that Senior "kept acting like he was trying to stab [Butler], but I kept grabbing his arm telling him stop, put the knife away." Barnes eventually pushed Butler into the pool room, and did not see where Junior and Senior went after the fight.

Kevin left the club with Butler, Jenkins, and Fenwick; they went to Fenwick's residence at Pegg's View Apartments. Upon hearing a commotion outside, Butler left the apartment, followed by Barnes, Jenkins, and Fenwick. Barnes saw two

---

3. We have not determined from the record whether John Barnes is related to Kevin Barnes.

people on the ground, their faces covered "with so much blood, you couldn't tell who they were." Barnes observed Junior reaching into an injured man's pockets, screaming at him, "[W]hat you got in your pocket, what you got in your pocket[?]" He also saw Butler push Junior away, stating: "[G]et off, that's my boys, get off." When Senior tried to hit Butler with the bat, Barnes intervened and was struck in the leg. Barnes recalled that Butler ran around the building, with Junior and Senior chasing him. Somerville told Barnes to get back. As he, Jenkins, and Fenwick ran toward Fenwick's apartment, they heard a gunshot.

William Somerville testified that he saw Butler throw an elbow while at the club. Butler also pushed appellant and grabbed him. When the Nunleys arrived at Pegg's View, appellant and Senior got out of the car. Appellant approached Omega, while Senior, who was carrying a bat, approached John. Appellant wrestled with Omega, and Senior struck John with the bat once. He then began to hit Omega. Somerville stated that it sounded like Senior "was hitting the concrete." During the fight, Kevin Barnes and Butler came outside and approached Senior. Butler ran, with Senior and appellant in pursuit. Then, Somerville heard a gunshot. But, he did not see anyone in possession of a gun. Later that morning, Somerville telephoned appellant and asked who had the gun. Appellant responded that Senior had it. Appellant also stated that he and Senior were the only people involved in the incident.

Schindler recalled that, at Pegg's View Apartments, he was sitting in the Bronco with Scriber, Hebb, and Somerville when they heard some noise. They exited their vehicle and walked "real slow" toward the commotion. Schindler saw "silhouettes of a bat swinging and people jumping around, just look like fighting." But, he did not know who wielded the bat. Then, Butler came outside, followed by Kevin Barnes. When Butler "got down there," Schindler heard someone say, "[T]here he is[.]" Schindler then saw "people take off running behind that corner[,]" but Schindler could not see who they were. Mo-

ments later, Schindler heard a gunshot. Then, Senior ran toward his car, carrying a bat.

Rufus Butler[4] testified that he saw appellant "swinging at" the bouncer, Steven Maddox. Rufus attempted to help Maddox, but Senior intervened and told appellant not to fight. However, Senior asked Butler to identify the people who had been fighting with Junior. Senior also pulled out a gun, but he put the gun in his pocket when appellant stood at the door.

Maddox recalled that, when Senior returned to the club, he "asked where the fellas was at." Maddox told him that they were gone. Senior reached into his pocket, pulled out a gun, and stated: "[T]his is what I got for the fellas[.]" Maddox described the weapon as a small, black handgun.

Katrina Fenwick, the victim's girlfriend, testified about the "scuffle" at the club involving Butler, appellant, and an older man who brandished a knife. Soon after arriving at Fenwick's apartment, they heard a commotion and Butler "stormed out of the door[.]" Barnes also went outside, because Fenwick asked him to get Butler. Fenwick testified: "So when Kevin went down the stairs, at that point I was nervous, I didn't know what to do. I went to the dishwasher and grab a knife. I didn't know if they were going to come up to my apartment, so I grabbed a knife, went outside." Once outside, Fenwick found John and Omega Nunley on the ground. Then, Fenwick heard a gunshot.

Appellant, who was born on September 5, 1977, was arrested by Detective William Raddatz on March 21, 2001. As the detective read the indictment to appellant, he interjected: "[D]amn, all I did was beat the boy." Appellant had not yet received his Miranda[5] warnings, because Detective Raddatz had not intended to question appellant at that time.

---

4. We do not know whether Rufus Butler was related to the decedent.

5. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Detective Steven Hall interviewed appellant at approximately 3:00 p.m. on March 5, 2001. The detective advised appellant of his *Miranda* rights; appellant agreed to provide a taped statement,[6] which was played for the jury. In his statement, appellant informed the detective that he was with his father, Somerville, and John Barnes at the club. "Fats, Snowman and Omega" were also present. According to appellant, "Fats was throwing elbows" while they were dancing. An altercation erupted involving appellant, Senior, John Barnes, and Somerville; "somebody hit [appellant]" causing him to fall to the ground.

After leaving the club, they went to Gough's house and obtained a gun. He thought the people in the Bronco "already had the baseball bat in the ... truck." When they went to Pegg's View, they were "looking for" Butler to "fight one on one[.]" John and Omega Nunley arrived, and appellant said he and Senior "ran after 'em." Senior struck Snowman first, with a baseball bat; appellant was fighting with Omega. Then, Senior hit Omega. When Butler came outside, appellant said they "cracked his bones, well we cracked him with the baseball bat." Then, while appellant and Omega were "on the ground fighting," appellant "heard a gunshot." At that point, "[e]verybody ran [back] to the car." When asked, "who shot the gun," appellant replied: "My dad did." Appellant claimed that his father threw the gun in the woods.

The defense did not present a case. We shall include additional facts in our discussion.

## II. DISCUSSION

### A.

As we noted, Senior was charged in this incident but was tried separately. At issue here are the statements that Senior made to various police officers, which were incriminating as to him and exculpatory as to appellant. Because the trial court

---

6. The record contains a transcript of the statement.

refused to admit Senior's statements at appellant's trial, as declarations against penal interest, appellant urges us to reverse. We discern neither error nor abuse of discretion.

Prior to trial, the State moved *in limine* to exclude Senior's statements. In connection with that motion, the court conducted an evidentiary hearing during the trial, outside the presence of the jury. Senior invoked his right to remain silent under the Fifth Amendment. Therefore, it is undisputed that Senior was unavailable within the meaning of the declaration against penal interest exception to the hearsay rule.

Corporal Terence Black testified that, on March 5, 2001, while Senior was in the holding cell, he commented "that he had shot that man, and that his son didn't have anything to do with it." The corporal asked Senior if he remembered being advised of his *Miranda* rights and Senior remarked that he did. Corporal Black testified: "And then he again stated to me that . . . this was all my fault, my boy didn't have nothing to do with it." Corporal Black again read Senior his *Miranda* rights, escorted him to the police cruiser, and transported him to the detention center.

En route to the detention center, Senior reiterated to Black that "his boy didn't have anything to do with this, and that he [Senior] was responsible for it, and that it was all his fault." Corporal Black asked Senior "what happened down there last night[,]" and Senior responded "that he shot that man, he shouldn't have been messing with those young boys down at the bar." Senior explained that "the individual ran from him. The individual bent down, when he bent down, he [i.e., Senior] shot him in the back of the head." According to Black, when Senior made the statements he knew he was facing a considerable amount of jail time. The defense also elicited that Senior said, "I guess I'm going to be here a long time this time for killing a man, but I got to pay for what happened, it was my fault."

The trial court then conducted the following inquiry:

THE COURT: Was your thinking, Officer Black, that there was at least a possibility that the declarant, Stewart, Sr. was making it up so that he could help his son?

[BLACK]: At first I thought he was being sincere with me, but then he made a comment that kind of changed my opinion a little bit when he said, you know, I got to pay for what's been done, and it's all my fault. And I even asked him—

THE COURT: As if he instigated the proceedings, but may not have been the actual actor?

[BLACK]: That's correct.

THE COURT: That was your mental impression?

[BLACK]: Yes.

Additionally, the court asked: "Officer Black, would you characterize this statement as one that you are not going to the bank with?" Black responded: "That's right." The court promptly ruled that Senior's statements to Corporal Black were inadmissible.

Appellant then called Officer John Bartlett, III, of the St. Mary's County Sheriff's Office. He testified that, on March 9, 2001, at approximately 10:30 a.m., while at the detention center, Senior asked the officer to read aloud to him a newspaper article about Butler's death. As Officer Bartlett read the article, Senior interrupted and said: "What else was I supposed to do." Senior also told the officer that Butler had "started the fight with him" and that he, Senior, "fired a weapon," but that "he just fired one shot." Moreover, Senior claimed he "never meant to kill anyone." In addition, Senior claimed: "If I hadn't killed him, he was going to kill me. He was bigger and younger than me." Senior added: "He hit me upside my head with a bottle" and "I had to protect myself."

According to appellant's counsel, Senior had no "motive to falsify" in regard to his statement to Bartlett. The court disagreed, concluding that this hearsay statement was not sufficiently trustworthy. The court stated, in part:

[W]hen he [Senior] makes the statement to the correctional officer, he says, well, what was I supposed to do, as if suggesting that he did it all right, but it was self-defense. Also suggesting that maybe at the time Nunley had a bottle and was going to attack him. *So while he says he did it, he's also offering the officer, the correctional officer his defenses.* And what that brings up in the Court's mind is that it's—it just doesn't appear that the statement is trustworthy enough to use.

\* \* \*

*[M]y conclusion would be that Senior is operating here to shield his son, but also to some degree looking after his own interest.*

So I don't believe, and my ruling is that that statement by the correctional officer should not be admitted.

(Emphasis added).

Appellant also called Detective William Raddatz. He noted that Senior voluntarily went to the sheriff's headquarters on the morning of March 5, 2001, and orally admitted that he shot Butler and struck the Nunleys with a baseball bat. He was then arrested and subsequently provided two tape recorded statements. According to Detective Raddatz, after Senior provided his first statement, he (Raddatz) checked on the progress of the investigation and discovered "inconsistencies" between Senior's statement and what the other officers had learned. Therefore, a second taped statement was obtained from Senior about an hour later. Both tapes were played for the court.[7]

The first statement was taken at 11:00 a.m., after Senior was advised of his *Miranda* rights. In that statement, Senior acknowledged that he was involved in an altercation at Butler's Place, and then he "got in a fight" with "three boys" at Pegg's View. He claimed that two of the "boys" were "trying to hit [him] with bats," so he hit each of them "one time."

---

7. Although we have not located the tapes in the record, the record contains transcriptions of the statements.

Senior also said that "another boy had a knife," and he "thought" that person also "had [a] gun." Senior recalled that when "he [i.e., Butler] reached down for a gun," Senior "shot the other boy." Senior did not know, however, who gave him (Senior) the gun. According to Senior, "everybody" got out of the vehicles to fight because the others "swung on [Senior] with a bat, and another boy had a knife throw [sic] at me. . . ."

Senior related in his second statement that he had been involved in a fight at the bar, and claimed "everybody in the whole bar got fighting." According to Senior, after his group left the bar, they "stopped" at Gough's place. When Senior was asked why he went to Gough's house, and what he got at Gough's residence, he responded: "I didn't go there for nothing. . . . I didn't get nothing from him." Senior added: "I don't know whether the gun was gotten or not. All I seen was a white paper bag. . . ." Moreover, Senior claimed that he did not know who had the bag, adding: "One of them other boys [in the Bronco] had it. . . ." Senior insisted that he "never touched no bag," nor did he "know what's in the bag." The following ensued:

THE COURT: Stop the tape there for a minute. Officer, at this point you know that when Senior says to you, in effect, he didn't get anything from Stuart Gough's house, you know he's lying?

[DETECTIVE RADDATZ]: Yes, sir.

THE COURT: Okay.

[DETECTIVE RADDATZ]: He had already told me earlier, we weren't being taped, that he got—the gun was in a white paper bag. He got the gun from Stuart Gough's house.

THE COURT: Right. He's clever enough when he gets on tape he doesn't want to repeat that?

[DETECTIVE RADDATZ]: Yes, sir.

THE COURT: Correct?

[DETECTIVE RADDATZ]: Yes, sir.

THE COURT: That was your assessment also. So his plan is, first of all, if he can lie his way out of it, he's going to?

[DETECTIVE RADDATZ]: Yes, sir.

THE COURT: But if you catch him in Court in a lie, then he is going to try to make a justification or rational[e] for what he did, correct?

[DETECTIVE RADDATZ]: I think he was trying to minimize certain things, certain aspects of it.

THE COURT: Right. *So he was, he was trying to reduce his own culpability if you really nailed him down?*

[DETECTIVE RADDATZ]: Yes.

(Emphasis added).

The tape was re-started, and the Detective asked Senior to identify the individuals involved in the altercation at Pegg's View Apartments. Senior responded that he did not know the "three boys," but he described one as "short, fat" and two as "tall and skinny." The court stopped the tape again, and the following exchange occurred:

THE COURT: Officer, he surely knows the boys; does he not?

[DETECTIVE RADDATZ]: It was my assessment that he did, sir.

THE COURT: He did. And when he describes them to you, you ask him could you describe them, his answer is short, fat, and tall and skinny, two of them is tall and skinny. You knew right then he was lying to you; didn't you officer?

[DETECTIVE RADDATZ]: Yes.

With respect to the altercation at Pegg's View, Senior said: "I know I done everything." He explained: "Well, I hit [the] boys with the bat and cause they had a bat at me I hit the boys . . . with a bat." He added: "They swung at me with a bat and I snatched back, I hit them back, I hit them with a bat. Cause they swung at me with a bat and I hit the other one with a bat, cause he swung at me." Senior, born in 1956, acknowledged that the Nunleys, in their 20's, are considerably younger than he is. He maintained that he hit Omega and John Nunley just "one time."

At that point, according to Senior, "another boy come around there with a knife or gun. . . ." Senior told Butler that he (Senior) had a gun, and Butler "turned around. . . ." According to Senior, Butler threw the knife at him, and Senior "ducked." Senior continued: "He (Butler) tried to stab me with it, he threw it at me." When Raddatz asked, "And then what did you do?", Senior replied: "I shot him."

Senior maintained that, at the time of the shooting, Butler "was coming towards me." Senior added that Butler had "reached down . . . beside the curb like he was going to get another gun." Further, Senior stated that "some other boys were around there shooting to[o]." The court interrupted and the following colloquy transpired:

THE COURT: Officer, at this point he seems to be suggesting that it's an all-out gun battle with numerous people shooting at one another, and he's just one of the combatants, but you knew that wasn't true; didn't you?

[DETECTIVE RADDATZ]: Well, his earlier statements were inconsistent with this and appeared to me that he was trying to minimize things as he went along to try to make up excuses. This part of his testimony was incredulous because of the way he told it happened initially was completely inconsistent with the way he was telling me is happening now.

THE COURT: What do you gather is his motive when he's talking with you at this point in the tape?

[DETECTIVE RADDATZ]: I think he knows that he's already told us that he did this, and it's going to have to go to trial, and he's going to have to come up with some sort of defense.

In his statement, Senior "forgot" who gave him the gun, nor did he know if it was someone who came to the area with him. Moreover, he could not identify the other people who were shooting. Afterwards, according to Senior, "somebody snatched the gun out of [Senior's] hand." When questioned about an inconsistency concerning the disposal of the gun, Senior responded: "My mind is all mixed up."

On cross-examination, Raddatz noted that, prior to the taped interviews, Senior had stated he was alone during the incident. The following exchange is noteworthy.

[PROSECUTOR]: And you ask him about the shooting, and reading from your report, he also did not reveal where he got the gun. He said someone at the scene in a fight gave it to him. He gave details about how he hit one of the victims with the bat and the other one in the head, correct?

[RADDATZ]: Yes, sir.

[PROSECUTOR]: At that point you tell him that John Barnes told you he and Stewart, Jr. were the people that beat the Nunley brothers. And he said he did it all, he said Stewart, Jr. didn't have anything to do with it, with the shooting or beating, he did it all, correct?

[RADDATZ]: That's correct.

[PROSECUTOR]: This is still all prior to the taped statements?

[RADDATZ]: Yes, sir.

[PROSECUTOR]: Okay. And at that point you say in your report he admitted that his son, Charles Henry Stewart, Jr., was present during the fight; however, he said that he [i.e., appellant] did not do anything. So this is the first time that he even acknowledges that Charles Stewart, Jr. was with him, correct?

[RADDATZ]: Correct, after we told him that John Barnes had told us that we knew he was there.

The defense attorney reiterated that the statements were trustworthy because they were against Senior's penal interest. In particular, as to the statements of March 5, she maintained that Senior had "very little time to think of a way to falsify." Claiming that all the statements were corroborated, she urged the court to admit the statements.

The court disagreed, characterizing Senior's statements as "untrustworthy." The court said:

What the defense wants me to do is to take only that portion of [the statement], I shot the fella, and exclude

everything else, and that would leave in the jury's mind that Senior is telling the truth. And the Court would be said to say earlier in this *Matusky* hearing that the statement made by Stewart, Sr. complies with the standards set forth in that case. I just don't see how that's possible.

Stewart, Sr. is a gentleman of extraordinarily limited education. Apparently he could not read. On the other hand, he is obviously very streetwise. Now, he is laboring, apparently, under the false belief that he can admit to his culpability, but at the same time minimize the consequences for himself and his son.

* * *

So here you are having Charles, Sr. say yeah, I shot the boy, but it really was in self-defense. Oh, yeah, I shot the boy, but he was going to use a bottle on me. Or rather yeah, I shot the boy, but he was going to use a knife on me. Then he wants to say that, well, I shot the boy, but after all, it was only part of a large gun battle and I'm just a mutual combatant.

Relying on *State v. Matusky*, 343 Md. 467, 682 A.2d 694 (1996), the court determined that Senior's statements were not admissible. It reasoned:

Now, we believe that Mr. Stewart had a motive to misrepresent what the actual facts were. It is true that he was admitting shooting someone, but he also is asserting his own self-defense to that shooting.

Secondly, he's trying to mitigate the extent of what he had cause[d] to happen. We consider the character of the speaker, his being held by the police. Although not educated, he's streetwise, he is trying his desperate best to get himself out of what he perceives his situation to be.

Whether the statement was made spontaneously. Well, of course, this statement was not.

* * *

You know it's entirely possible the Court thinks what's going on in Senior's mind is a very simple proposition.

Both of them are going to be charged with these heinous crimes, they are going to be tried separately. So when the son is tried, he, Senior can say that he [i.e., Senior] did it. And when the son gets off, the son comes in the second trial and says that he, the son, did it.

This statement and other statements made by the father, the Senior, in my judgment are not admissible under *State v. Matusky,* and the Court so rules.

## B.

As we noted, appellant contends that the trial court improperly excluded Senior's statements, which were exculpatory as to appellant. Relying on *Gray v. State,* 368 Md. 529, 796 A.2d 697 (2002), decided after appellant's trial, appellant contends that Senior's statements constituted declarations against penal interest.

We begin our analysis with a review of Maryland Rule 5–804, pertaining to the admissibility of declarations against penal interest. In part, the rule provides:

**Rule 5–804. Hearsay exceptions; declarant unavailable.**

(a) **Definition of unavailability.** "Unavailability as a witness" includes situations in which the declarant:

\* \* \*

(2) refuses to testify concerning the subject matter of the declarant's statement despite an order of the court to do so[.]

\* \* \*

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* .

(3) Statement against interest. A statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest, so tended to subject the declarant to civil or criminal liability, or so tended to render invalid a claim by the declarant against another, that a

reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

Maryland Rule 5–804 (2003) (emphasis added).

As we recently explained, under Rule 5–804(b)(3), the trial court must determine whether: "1) the declarant's statement was against his or her penal interest; 2) the declarant is an unavailable witness; and 3) corroborating circumstances exist to establish the trustworthiness of the statement." *Roebuck v. State,* 148 Md.App. 563, 578, 813 A.2d 342 (2002), *cert. denied,* 374 Md. 84, 821 A.2d 371 (2003).

 The proponent of the declaration has the burden " 'to establish that it is cloaked with "indicia of reliability" [, which] means that there must be a "showing of particularized guarantees of trustworthiness." ' " *West v. State,* 124 Md.App. 147, 167, 720 A.2d 1253 (1998), *cert. denied,* 353 Md. 270, 725 A.2d 1068 (1999) (citations omitted). The trial court's evaluation of the trustworthiness of a statement is "a fact-intensive determination" that, on appellate review, is subject to the clearly erroneous standard. *Matusky,* 343 Md. at 486, 682 A.2d 694; *see Powell v. State,* 324 Md. 441, 453, 597 A.2d 479 (1991); *Wilkerson v. State,* 139 Md.App. 557, 576–77, 776 A.2d 685, *cert. denied,* 366 Md. 249, 783 A.2d 223 (2001).

 "The corroboration requirement serves to deter 'criminal accomplices from fabricating evidence at trial.' " *Roebuck,* 148 Md.App. at 580, 813 A.2d 342 (quoting *United States v. Camacho,* 163 F.Supp.2d 287, 299 (S.D.N.Y.2001)). But, "there is no litmus test that courts must follow to establish adequate corroboration or trustworthiness." *Roebuck,* 148 Md.App. at 580, 813 A.2d 342. Ultimately, it is "within the trial court's discretion to determine whether the evidence was sufficiently reliable for admissibility." *Wilkerson,* 139 Md.App. at 577, 776 A.2d 685; *see West,* 124 Md.App. at 166, 720 A.2d 1253.

Several Maryland cases have elucidated the interrelated issues of corroboration and trustworthiness, usually in the context of declarations offered by the State. In *State v. Standifur*, 310 Md. 3, 526 A.2d 955 (1987), for example, the Court of Appeals considered the admissibility of a declaration against penal interest offered *against* the accused, not *by* the accused. The *Standifur* Court said:

> *The circumstances surrounding the making of the statement must be carefully analyzed to determine the likelihood that the statement was truthful. Critical to this analysis is the state of mind of the declarant at the time the statement was made.* Unless the declarant then believed the statement to be against his penal interest, there is no basis for presumed reliability. However, because of the unavailability of the declarant and other problems of proof, the party urging this exception is not required to prove the actual state of mind of the declarant but must prove sufficient surrounding facts from which the trial judge may inferentially determine what the state of mind of a reasonable person would have been under the same or similar circumstances....
>
> ... The more important criterion is that a reasonable person in the situation of the declarant would have perceived the statement as disserving at the time he made it....

* * *

In summary, a trial judge considering the admissibility of a hearsay statement offered as a declaration against penal interest must carefully consider the content of the statement in light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, *and determine whether the statement was in fact against the declarant's penal interest* and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made. The trial judge should then consider whether there are present any other facts or circumstances, *including those indicating a motive*

*to falsify on the part of the declarant, that so cut against the presumption of reliability* normally attending a declaration against interest that the statements should not be admitted. A statement against interest that survives this analysis, and those related statements so closely connected with it as to be equally trustworthy, are admissible as declarations against interest.

*Id.* at 12, 13, 17, 526 A.2d 955 (emphasis added).

The Court of Appeals also addressed the admissibility of a statement against penal interest in *State v. Matusky, supra,* 343 Md. 467, 682 A.2d 694, on which the trial court relied in excluding Senior's statements. Matusky was charged with two counts of first degree murder; one of the victims was the estranged wife of Richard White, Matusky's friend. *Id.* at 470, 682 A.2d 694. The police questioned Matusky, White, and White's fiancée, Rebecca Marchewka. White told the police that he knew nothing about the crimes, claiming that he had spent the entire day shopping with Marchewka. She initially corroborated White's account. *Id.* at 471, 682 A.2d 694. Three months later, in a conversation with Marchewka, White implicated Matusky in the murders. Marchewka contacted the police and retracted her prior statement. *Id.* At Matusky's trial, White invoked his Fifth Amendment privilege and refused to testify. *Id.* at 472, 682 A.2d 694. Through Marchewka, the State sought to introduce White's declaration against penal interest. Upon finding White unavailable, the trial court determined that Marchewka could testify as to White's declaration. *Id.* Accordingly, Marchewka testified that White told her that Matusky had killed the victims.

The *Matusky* Court explained that, after the proponent of the evidence establishes the first criterion—the unavailability of the witness—the trial court must " 'carefully consider the content of the statement ... and determine whether the statement was in fact against the declarant's penal interest....' " *Matusky,* 343 Md. at 479, 682 A.2d 694 (quoting *Standifur,* 310 Md. at 17, 526 A.2d 955). If the hearsay statement satisfies the second step, the trial court must next determine whether the facts establish that the declarant had

" 'a motive to falsify,' " which " 'cut[s] against the presumption of reliability normally attending a declaration against [penal] interest....' " *Matusky,* 343 Md. at 480, 682 A.2d 694 (citation omitted). The Court concluded: " 'A statement against interest that survives this analysis, *and those related statements so closely connected with it as to be equally trustworthy,* are admissible as declarations against interest.' " *Matusky,* 343 Md. at 482, 682 A.2d 694 (citation omitted) (emphasis added in *Matusky* ).

The Court concluded, however, that the fiancée's entire testimony should not have been admitted. *Id.* at 484, 682 A.2d 694. In its view, the trial court "erroneously permitted [the fiancée] to testify to the entire conversation she had with White." *Id.* at 492, 682 A.2d 694. Instead, it should have "parse[d] the hearsay declaration to admit only those individual statements that were contrary to White's penal interest...." *Id.* at 485, 682 A.2d 694. The Court explained that the "collateral portions of White's account should [have been] redacted," including the "portions of White's declaration identifying Matusky as the murderer...." *Id.* In its view, the parts of the declaration that "did not directly incriminate White" were "non-incriminating statements" as to the declarant, "because they serve[d] to shift blame from White to Matusky." *Id.* Therefore, the Court observed that the statements were "not as trustworthy." *Id.*

Recently, in *Gray v. State,* 368 Md. 529, 796 A.2d 697 (2002), the Court of Appeals discussed both *Standifur* and *Matusky.* However, in contrast to *Standifur* and *Matusky,* in which the State was the proponent of the declaration against penal interest, it was the defendant in *Gray* who sought admission of the declaration. *Id.* at 534, 796 A.2d 697.

Gray was convicted of the first degree murder of his wife, Bonnie. The theory of Gray's defense was that his wife was murdered by her lover, Brian Gatton; he allegedly told a woman named Evelyn Johnson that he had killed Bonnie. When Gatton refused to testify at trial, Gray sought to offer Gatton's statements through Johnson, as declarations against

penal interest. *Id.* at 534, 796 A.2d 697. Claiming that Johnson was not credible, the State objected. On appeal, Gray challenged the trial court's refusal to admit Gatton's statements as declarations against penal interest. The Court of Appeals agreed with Gray. *Id.* at 537, 796 A.2d 697.

The *Gray* Court considered it significant that the defendant was the one who sought to introduce the declaration. *Id.* at 538, 796 A.2d 697. Consequently, "the defendant's constitutional right to confront the witnesses *against* him is not implicated." *Id.* (Emphasis in original). In contrast, in *Matusky* and *Standifur* the declarations were offered by the State *against* the defendants. *Id.* Moreover, the Court observed that it was not the trial court's function to assess Johnson's credibility as the relator of Gatton's statements. *Id.* at 545, 796 A.2d 697. It noted that in *Standifur,* the trustworthiness assessment concerned the statement made by the unavailable declarant, not the trustworthiness of the in-court relator of the out-of-court declaration. *Id.* at 543, 796 A.2d 697. The Court explained:

The holding in *Standifur* (and in the cases generally) is concerned with assessing the trustworthiness of the out-of-court statement that inculpates, not exculpates, a defendant.[ ] There is nothing in *Standifur,* or in any of our cases of which we are aware, that in a jury trial specifically permits a trial court to make a factual assessment of the trustworthiness of the in-court relator of the out-of-court declaration that exculpates a defendant. The credibility of the witness in such cases is normally to be assessed as witness credibility is generally determined—by the trier of fact.[ ] An in-court relator of what she has heard outside the courtroom is, normally, as to whether she actually heard the declaration, in the same witness situation as an in-court relator of what they have seen outside the courtroom. Generally, credibility is tested by examining the witness, especially by cross-examination of the witness by the opposing party, which in the present case at the pre-trial hearing

was vigorous and extensive. In a jury trial, it is, generally, not the court's function to assess that type of credibility. *Gray*, 368 Md. at 544–45, 796 A.2d 697 (footnotes omitted).

The *Gray* Court reiterated, however, that Rule 5–804(b)(3) requires corroboration of "a declarant's inculpatory statement that exculpates an accused...." *Id.* at 545 n. 11, 796 A.2d 697. But, it found that corroboration from the fact that Gatton and the victim were involved in a love triangle; Gatton possessed jewelry similar to that worn by the victim; Gatton had Johnson pawn some of the jewelry; Gatton displayed a hunting knife and a small handgun when he made the statements; and the victim was shot and stabbed. *Id.* at 545–46, 796 A.2d 697. Accordingly, the Court concluded, at 368 Md. at 547, 796 A.2d 697:

> Under the circumstances here present, petitioner was entitled to present his defense, *i.e.*, that Gatton killed Bonnie Gray. When Gatton, through the invocation of his right to remain silent became unavailable, petitioner was, under the facts of this case, entitled to present to the jury Gatton's declarations against penal interest through the person that allegedly heard the declarations, Evelyn Johnson. Under the circumstances here present, it was error to deny their admission.

After *Gray* was decided, this Court was faced with a similar issue in *Roebuck, supra,* 148 Md.App. 563, 813 A.2d 342. There, the young victim died as a result of numerous knife and gunshot wounds. Roebuck and his cousin, Rolston James, Jr., were both charged with the murder. *Id.* at 569, 813 A.2d 342. During a custodial interrogation, Roebuck admitted that he gave the gun to James but claimed James killed the victim. In his custodial statement, James admitted to the crime, but claimed that Roebuck "physically" tried to "stop" him during the attack. *Id.* at 570, 813 A.2d 342. At James's murder trial, the State used James's statement against him to secure a conviction. Then, at Roebuck's trial, James refused to testify because his appeal was pending. Accordingly, Roebuck sought to introduce in evidence the statement James gave to

police, claiming it was a declaration against penal interest. The trial court ruled that James's statement was not trustworthy and refused to admit it at Roebuck's trial. *Id.* at 575, 813 A.2d 342.

Relying on *Gray,* we concluded that the trial court erred. *Id.* at 590, 796 A.2d 697. We found corroboration of James's statement in the State's theory of the case, which was that Roebuck gave the gun to James. In addition, James's statement was corroborated by the testimony of a key State witness who had driven the group to and from the area where the murder occurred. Further, we considered it significant that the State itself evidently regarded James's statement as trustworthy, because it relied on the statement at James's trial to establish James's culpability. *Id.* at 592–94, 796 A.2d 697. Concluding that the trial court erred, we said, *id.* at 594, 796 A.2d 697:

> In reaching our conclusion, we are mindful that "the exclusion of a statement exculpating an accused could result in an erroneous conviction." [*State v. Anderson,* 141 Wis.2d 653, 416 N.W.2d 276, 280 (1987)]. Moreover, given a defendant's constitutional right to present a defense, *id.* at 279, a defendant should not be subjected "to an insurmountable evidentiary hurdle" to obtain admissibility of a hearsay statement that is central to the defense and has been sufficiently corroborated. *Id.* at 280. Ultimately, it is for the fact finder to assess the veracity of the declaration. *Id.*

As we see it, this case is more akin to *Gray* and *Roebuck* than to *Matusky* and *Standifur,* because it was the defendant, not the State, who sought admission of Senior's putative declarations against penal interest. That is where the similarities with *Gray* and *Roebuck* end, however. The errors that led to the reversals in those two cases are not present here.

In *Gray,* the Court concluded, *inter alia,* that the trial court usurped the jury's function in assessing the credibility of the "relator" of the declaration against penal interest. That did not happen here. In *Roebuck,* the Court concluded, *inter alia,* that the trial judge erroneously overlooked the corroboration

of James's declaration, including the State's own use of James's statement at James's murder trial. In addition to these distinctions, other factors lead us to uphold the trial court. We explain.

With regard to a statement against penal interest that is offered by the defense to exculpate the accused, some courts have recognized a "specific concern" that "the accused or the declarant, or both, may have a motive to fabricate the statement." *State v. Anderson*, 141 Wis.2d 653, 416 N.W.2d 276, 280 (1987); *see Roebuck*, 148 Md.App. at 582–83, 813 A.2d 342. In *United States v. Camacho*, 163 F.Supp.2d 287 (S.D.N.Y. 2001), the federal court undertook a thorough review of the statement against penal interest hearsay exception to elucidate the various factors that generally pertain to corroboration and trustworthiness. *See also United States v. Desena*, 260 F.3d 150, 158–59 (2d Cir.2001) (focusing corroboration analysis on the trustworthiness of the out-of-court statement, and not on that of the declarant or the witness who related the statement); *United States v. Doyle*, 130 F.3d 523, 544 (2d Cir.1997) (" 'It is the statement, not the witness or the declarant, that must be trustworthy' " . " 'The corroboration requirement should not be used as a means of usurping the jury's function' " of assessing the credibility of witnesses) (citations omitted).

■ Among the factors identified by the court in *Camacho*, the relationship between the declarant and an accused is a key consideration. *Camacho*, 163 F.Supp.2d at 306–07; *see, e.g., United States v. Duke*, 255 F.3d 656, 658–59 (8th Cir.2001) (involving statement by defendant's brother), *cert. denied*, 534 U.S. 1022, 122 S.Ct. 550, 151 L.Ed.2d 426 (2001); *United States v. Katsougrakis*, 715 F.2d 769, 777–78 (2d Cir.1983) (upholding admission of testimony of wife of declarant, because declarant "had no motive to lie to his wife" in describing declarant's participation in defendant's arson scheme), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *United States v. Silverstein*, 732 F.2d 1338, 1346 (7th Cir.1984) (stating that certain "statements are suspect because of a

long-standing concern—whether or not well-founded—. . . that a criminal defendant might get a pal to confess to the crime the defendant was accused of . . ."), *cert. denied*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Certainly, in a murder case in which a father and son are both implicated, the close familial bond of father and son raises the specter that Senior had a motive to fabricate to protect his son.

The *Camacho* court also observed that, when "a statement directly inculpates the declarant, *and no one else*," that circumstance is a factor "in favor of its reliability." *Camacho*, 163 F.Supp.2d at 305 (emphasis added). Here, the declarant did not fully inculpate himself. To the contrary, Senior sought to exculpate both himself *and* his son; he stated that he (Senior) committed the crimes, but claimed, in effect, that he acted in self-defense.

■ In addition, the consistency of a declarant's statement is an important factor for the court to consider. *See Roebuck*, 148 Md.App. at 584, 813 A.2d 342; *see also United States v. Bahadar*, 954 F.2d 821, 829 (2d Cir.1992) ("[R]epeated changes in [the declarant's] story . . . would properly make any [court] suspicious of the statement's reliability."), *cert. denied*, 506 U.S. 850, 113 S.Ct. 149, 121 L.Ed.2d 101 (1992). In this case, there were several inconsistencies in Senior's various accounts, which engendered the trial court's skepticism as to the trustworthiness of the declarations.

We are amply satisfied that the trial court carefully complied with the directive announced in *Standifur* and reiterated in *Gray:* " 'The circumstances surrounding the making of the statement . . . must be carefully analyzed to determine the likelihood that the statement was truthful.' " *Gray*, 368 Md. at 543, 796 A.2d 697 (quoting *Standifur*, 310 Md. at 12, 526 A.2d 955). In regard to the matter of trustworthiness, the court recognized that Senior's statements were made when he knew that his son was either being sought by the police or had already been arrested. It is also noteworthy that Senior attempted to assume full responsibility for all three attacks. The court apparently regarded Senior's claim that he acted

alone as entirely implausible, given that three people, almost half Senior's age, were either seriously wounded or killed. Nor did the court credit Senior's assertion in one of his statements that he did not know the identity of the three victims.

With regard to trustworthiness, it is also significant that Senior repeatedly suggested in his statements that he acted in self-defense. For example, Senior claimed that the Nunleys had the baseball bat and swung at him. Senior also contended that he hit each of them just "one time." He also asserted that Butler came at him with a knife or gun and "tried to stab" him. Further, Senior said that it seemed as if Butler was reaching for a gun and, in response, Senior "shot him." Senior's effort to characterize his own actions as defensive in nature rendered his statements self-exculpating, not self-incriminating. Therefore, they were less trustworthy within the meaning of the hearsay exception in issue.

Moreover, by the time the court conducted the evidentiary hearing, it had heard virtually all of the evidence. That evidence simply did not corroborate Senior's assertions that he acted alone in striking the Nunleys and shooting Butler.

Finally, even if the evidence was not entirely clear as to whether it was appellant or Senior who pulled the trigger, Senior's statements were not exculpatory as to appellant. There was evidence that appellant obtained the gun from Gough; both father and son intentionally went to Pegg's View seeking revenge; they both chased Butler around the building as he fled; and appellant had possession of the weapon immediately after the shooting. Based on principles of accomplice liability, which the State advanced, Senior's statements did not necessarily exculpate appellant.

In our view, this case is not controlled by *Roebuck* or *Gray*. Senior's attempt to paint himself as the sole combatant, with Goliath power, involved in a melee in which he acted in self-defense, understandably led the court to regard his declarations as untrustworthy. We decline to second guess the trial court.

## III.

Claiming that his statement to the police was the result of an illegal, warrantless arrest, for which there was no probable cause, appellant moved to suppress. On appeal, he complains because the court allowed the State to re-open its case to establish the probable cause for the arrest. This claim is unavailing.

At the motion hearing, Detective Russell Trow testified that, on March 5, 2001, based on Senior's statement and information obtained from other witnesses, the Sheriff's Office believed that Junior had participated in the crimes. The detective testified, however, that he did not know the names of these witnesses, because he had obtained this information from other officers.

Sergeant Lyle Long directed Detective Trow to apprehend appellant. At approximately 2:00 p.m. on March 5, the detective found appellant at his girlfriend's residence and, without a warrant, arrested him for the crimes of homicide and assault. The detective also gave appellant his *Miranda* warnings. At the time of the arrest, Detective Trow knew that Senior had told the police that appellant was not involved in the offenses.

Detective David Alexander was the lead investigator in the case. He was asked if he could recount the information that the Sheriff's Office had obtained prior to appellant's arrest, but the detective was unable to do so. He stated: "No, sir, I can't, because I—it may have been after that that I found the whole—all the information."

Detective Raddatz testified that Senior had informed him that appellant was at the scene of the homicide and had been in a vehicle with Senior. The detective also recalled that other officers had obtained information from Somerville, indicating that appellant was involved in the homicide. But, Detective Raddatz had not interviewed Somerville. Further, Detective Raddatz recalled that, in Senior's second statement, he indicated that someone in his party had given the gun to him and that, after the shooting, he had given the gun to

someone in his group. Moreover, he said that appellant was with him that morning.

Detective Steven Hall testified that he interviewed appellant at approximately 3:00 p.m. on March 5, 2001, and advised him of his constitutional rights. Appellant indicated that he understood his rights and was willing to make a statement about the incident. During Detective Hall's testimony, the court commented:

All this is fine, but this is beside the point that we are here to deal with initially, and that is the quantum of the information that the police department had on or before March 5, 2001 at 2:00 p.m. Because that is going to determine whether or not probable cause existed for that arrest.

Now, here you are going out on tangents having nothing to do with that issue. And that might have to do with a different issue, but we deal with one issue at a time. Now, if you got a witness that's going to talk about that subject, now is the time to call him and let this officer stand down.

Sergeant Long was then called to testify. He stated that, at about 8:00 a.m. on March 5, 2001, information had been obtained from Somerville that Junior and Senior were both involved in the incident. According to Long, Detective Hall, who had interviewed Somerville, informed him that Somerville had stated that appellant had fought with the Nunleys.

Detective Steven Hall, who was recalled, testified that he interviewed Somerville prior to 2:00 p.m. on March 5, 2001. During the interview, Somerville stated that, while the group was at Church's Chicken, they decided to go to Pegg's View Apartments, where the victim lived. According to Somerville, after they parked, "[t]hey shot past us in a car, a car was before them with two people in there. And when the two guys got out, they started fighting, you know, with bats and stuff." Somerville identified Senior as the one holding the bat.

The following exchange between Detective Hall and the court is pertinent:

THE COURT: So all William Somerville is saying—and I want you to correct me if I'm wrong—is that Charles Stewart, Jr. was present?

[HALL]: Yes.

THE COURT: But he didn't see him attack the victims?

[HALL]: He indicated that there was a fight, but that the only person involved in the melee with a bat was Charles, Sr. And I tried to make sure that that was clear in the interview, that Charles, Sr. was the only person holding a bat, but there was apparently quite a melee outside.

THE COURT: What information do you have that Junior did something, I mean used his fist, his hands, something to do injury to somebody else?

[HALL]: I'm trying to recall if—the only information that I have that would have indicated that prior to me interviewing the Defendant would have probably been with Robert Maurice Scriber, and what that—I would like to get a transcript of that.

\* \* \*

He was with Somerville trying to prevent Somerville from going down where the melee was occurring out of fear. And they could hear the ping, ping of the bat, but that the party, including Senior and Junior, were involved in the melee. But as far as I never had any information that he had hit anybody with a bat. I just know that based on what they were saying, that father and son were involved in the melee with both the Nunleys and when Mr. Butler came out.

That's all prior to the statement with the Defendant. And, of course, the situation initially started at Butler's Place where the Defendant and the victim were involved in an altercation that ultimately ended in the Defendant being kicked out of the bar. And then they went to Pegg's View in a gray Oldsmobile, and the Nunleys exited in another vehicle that was ahead of them, and the fight began.

Detective Trow was also recalled. He identified Strawberry as Katina Bryant, a.k.a., Katina Jenkins. The detective testi-

fied that he also interviewed Kevin Barnes, who informed him that he was in the apartment with the victim when they heard a commotion outside. Barnes related that Butler went outside, and Barnes followed a few moments later. Barnes saw two people on the ground, both with blood on their faces. Appellant was on top of one of the victims, asking the victim if he had any money, and going through the victim's pockets. Senior had a bat in his hand. Senior asked Butler if he had any money and, according to Barnes, they decided to "get him too." As Barnes attempted to intervene, he was hit in the leg with the baseball bat. Somerville then pointed a gun at Barnes and told him to back off. Butler ran, but Junior, Senior, Somerville, and another individual chased him. While Barnes walked back to the apartment, he heard a gunshot.

Further, Detective Trow testified that, on March 7, 2001, Kevin Barnes was shown a photographic array and selected appellant as one of the participants. Although the detective believed that Barnes knew appellant, he claimed it was common practice to have a witness view a photo array. The detective could not explain, however, why only one photographic array was prepared.

During argument on the probable cause aspect of appellant's motion, the court commented:

So the question is in all this voluminous information, so to speak, what was it there that says that Stewart, Jr. is more likely than not the person who committed a felony? And that's the question, and that's why the Court kept asking well, what exactly did you know or who said that.

\* \* \*

And you've got to admit that it's very, very sketchy and generalized. Somebody's involved in a melee. Well, what's that mean?

The court then gave the parties five days to submit memoranda on the issue of whether the police had probable cause to arrest appellant. Four days later, the State moved to reopen the hearing to present additional testimony or to supplement the evidence.

At a second hearing, the court discussed the State's request to reopen. The defense attorney argued: "[I]t is offensive to the rights of my client to allow [the State] to have a do-over." Pointing to the State's failure to seek a continuance, she added: "[J]ustice is best served and being done when we are done...." The court responded that it had "thought about this, balanced it out." The court observed that, despite a lengthy hearing, "the upshot of it was that [the State's] evidence fell short" in establishing probable cause for the warrantless arrest. Nevertheless, while expressing "sympathy" for the defense's position, it said that, "as a practical matter," if the State's motion to reopen were denied, and appellant's motion to suppress were granted, the State "would enter a nol pros in the case, would recharge and start over and would be redoing the whole scenario." Therefore, it "reluctantly" granted the State's request to reopen, stating: "[T]he Court's analysis is that upon review by an Appellate Court to refuse to permit the reopening, would constitute an abuse of discretion."

Thereafter, the State called Detective David Yingling, who testified that he interviewed John Barnes at approximately 7:30 a.m. on the morning of the shooting and obtained two taped statements from him. Transcripts of those statements were admitted as exhibits. After interviewing Barnes, Detective Yingling contacted Sergeant Long and Lieutenant Horne and advised them that appellant had possession of a firearm immediately after the shooting. Barnes subsequently took the detective to the wooded area, where the bat was recovered. Thus, the evidence showed that the State's interview of Barnes and the recovery of the bat both *preceded* appellant's arrest.

Accordingly, the suppression court denied appellant's motion. It found that, based on Barnes's statement, appellant had possession of the gun after the shooting, and the State had probable cause to arrest him. In an opinion of July 27, 2001, the court said:

The Court notes that the facts elicited by the State during the [first suppression] hearing, and standing alone, fell far

short of probable cause to believe that defendant committed a felony. At that hearing, the State merely established that prior to defendant's arrest the investigating officers had the following facts within their collective knowledge: defendant was present during the beatings and murder; defendant was standing over a "subject" and going through that person's pockets; Stewart, Sr. shot Butler and gave the gun to an unidentified person. Today [at the second hearing], however, Detective Yingling's testimony, coupled with that from the previous hearing, provides specific and articulable facts which taken together with rational inferences permits the Court to conclude that probable cause existed to believe that defendant committed a felony. As such, defendant's warrantless arrest was legal.

Appellant now contends that the court abused its discretion in permitting the State to reopen its case. He claims that the State's failure to present all the necessary evidence at the first hearing did not constitute good cause to allow the State to reopen its case. Moreover, appellant observes that the court seemed inclined to deny the State's motion, but apparently did not do so out of fear of reversal. Thus, appellant claims that the court failed to exercise its discretion, in that it did not believe that it was free to deny the motion to reopen.

Appellant relies on *Cason v. State,* 140 Md.App. 379, 780 A.2d 466, *cert. denied,* 367 Md. 89, 785 A.2d 1292 (2001), and *cert. denied,* 370 Md. 269, 805 A.2d 265 (2002). There, the police responded to Cason's house when he called to report a burglary. Upon entering Cason's residence, the police observed no evidence of forced entry, but noticed, *inter alia,* an open tool box containing several hundred empty gelatin capsules in the dining room and a plastic bag containing a white substance. Vials and capsules were also found in the basement. Prior to trial, Cason moved to suppress the drugs seized from his residence. At the hearing, two officers testified for the State. Cason and his mother, who owned the residence where Cason lived, also testified. One officer testified as a rebuttal witness. The defense presented no surre-

buttal. The drugs seized in the search of the residence were not moved into evidence. *Id.* at 388, 780 A.2d 466.

During closing arguments, Cason's counsel claimed that the police had acted improperly in going into the basement of the house. *Id.* at 389, 780 A.2d 466. Later, during the prosecutor's argument, the court asked about the items found in the dining room. The prosecutor stated that the officer's testimony indicated, in part, that there were gelcaps found in the toolbox. The court then wanted the prosecutor to "[p]ut on that table the bag of narcotics [t]hat was found in the dining room.... I want to see the bag of narcotics from the dining room." *Id.*

The prosecutor responded that the contraband had not been admitted into evidence. When the court learned that the contraband was in the prosecutor's office, it directed the State to retrieve it. The court also directed the police officer to indicate what part had been found in the dining room of Cason's residence. A second officer then identified the bag that had been sitting in the toolbox in the dining room. The trial court subsequently denied Cason's motion to suppress, finding that the police had lawfully entered the residence because the defendant had called them to the premises to investigate the alleged break-in. In addition, the court concluded that the officers properly searched the premises and found the contraband in plain view. *Id.* at 389–90, 780 A.2d 466.

On appeal, Cason argued that the trial court had assumed the role of a prosecutor. Further, Cason claimed that the court abused its discretion in reopening the evidence to take additional testimony that the State failed to introduce during its presentation of the case. *Id.* at 390, 780 A.2d 466. The Court was satisfied, however, that the trial judge "did not abuse his discretion in reopening the evidence in order to examine the bag of gelatin capsules, and did not take on the role of advocate in doing so." *Id.* at 393, 780 A.2d 466. We pointed out that the State had not attempted to deliberately withhold evidence in order to present it at a later time and

gain an unfair advantage. Moreover, the evidence merely corroborated and clarified the officer's testimony describing the gelatin capsules found in the toolbox; the demonstration did not present entirely new evidence or cure a defect in the State's case. Nor was there any danger that a jury was unduly prejudiced, given that the proceedings were before the court. Furthermore, Cason had the opportunity to cross-examine and present rebuttal evidence. *Id.* at 392–93, 780 A.2d 466.

Writing for the *Cason* Court, Judge Deborah Eyler explained:

> In general, the court has "broad discretion to reopen a case to receive additional evidence." *Dyson v. State,* 328 Md. 490, 500, 615 A.2d 1182 (1992); *see also Spillers v. State,* 10 Md.App. 643, 649, 272 A.2d 49 (1971) (stating that "[o]rdinarily, there is no abuse of discretion in permitting the State to reopen its case for the purpose of proving important or even essential facts to support a conviction. . . .") The critical issue in determining whether a court abused its discretion in reopening the case is whether its doing so "impaired the ability of the defendant to answer and otherwise receive a fair trial." *State v. Booze,* 334 Md. 64, 76, 637 A.2d 1214 (1994), *subsequent appeal at* 111 Md.App. 208, 681 A.2d 534 (1996), *rev'd on other grounds,* 347 Md. 51, 698 A.2d 1087 (1997).

> Usually, whether the reopening of evidence impaired the defendant's ability to receive a fair trial "is answered by reference to the State's intention in withholding the evidence, *i.e.,* whether it did so in order to gain an unfair advantage from the impact later use of the evidence likely would have on the trier of facts, the nature of the evidence, and its relationship to evidence already in the case." *Id.* (citing *State v. Hepple,* 279 Md. 265, 271, 368 A.2d 445 (1977)). In exercising its discretion, the court

> "must consider whether the State deliberately withheld the evidence proffered in order to have it presented at such time as to obtain an unfair advantage by its impact on the trier of facts. To this end the judge must see whether the

proposed evidence is merely cumulative to, or corroborative of, that already offered in chief or whether it is important or essential to a conviction." [*Hepple v. State,* 31 Md.App. 525, 534, 358 A.2d 283 (1976), *aff'd, State v. Hepple,* 279 Md. 265, 368 A.2d 445 (1977)]. Other factors which have been identified as important to the assessment of the propriety of the trial court's exercise of discretion to vary the order of proof include:

"Whether good cause is shown; whether the new evidence is significant; whether the jury would be likely to give undue emphasis, prejudicing the party against whom it is offered; whether the evidence is controversial in nature; and, whether the reopening is at the request of the jury or a party." *Dyson v. State,* 328 Md. 490, 615 A.2d 1182 (1992).

*Cason,* 140 Md.App. at 390–92, 780 A.2d 466 (alterations in *Cason* ). *See also Collins v. State,* 373 Md. 130, 142–143, 816 A.2d 919 (2003) (upholding the trial court's ruling, which granted the State's request to reopen its case when an eyewitness in a murder case had been located).

██ Here, the issue arose during a suppression hearing, so there was no danger that a jury would give undue emphasis to the evidence. Moreover, there is no indication that the State deliberately withheld the evidence. Indeed, the State thought it had established probable cause, and it only sought to reopen because the court intimated otherwise. Furthermore, appellant had the opportunity to cross-examine. Therefore, we are not persuaded that the court abused its discretion.

Nor are we persuaded that the court failed to exercise its discretion. Indeed, the court clearly recognized that it had discretion to reopen the case. It said:

We have, day one, insufficient evidence of probable cause. Day two, cleaning up their act, they [the State] finally get it together. That's what you have.

And the question here is whether or not, given that scenario, it would be an abuse of discretion by the Court not to permit the reopening. That's the issue.

Although the court commented on the possibility of reversal by an appellate court if it did not allow the State to re-open, we do not construe that remark to reflect the court's belief that it had no choice but to grant the State's motion. Based upon the entire exchange, it is evident that the court struggled with the matter and, "on balance," opted to allow the State to reopen.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**